Sidney S. HICKLIN, Ruby E. Dorman, Betty Cloud, Tommy Ray Woodruff, Frederick A. Mathers, Harry A. Browning, Emmett Ray, and Joseph G. O'Brien, Appellants,

v.

Edmund ORBECK, Commissioner of the Department of Labor of the State of Alaska, and Guy Richard Martin, Commissioner of the Department of Natural Resources of the State of Alaska, Appellees.

No. 3025.

Supreme Court of Alaska.

June 3, 1977.

Robert H. Wagstaff, Wagstaff & Middleton, Anchorage, for appellants.

Ronald W. Lorensen, Asst. Atty. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellees.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

CONNOR, Justice.

### I

This case considers the constitutionality of the "Alaska Hire" law, AS 38.40. "Alaska Hire," enacted in 1972 and amended in 1976, requires that all oil and gas leases, easements or right-of-way permits for oil or gas pipelines, unitization agreements or any renegotiation of any of these to which the state is a party, contain a requirement that qualified Alaska residents be hired in preference to nonresidents. The statute does not apply to other private employment, nor to public employment.[1] AS 38.40.090(1) defines a resident for these purposes as a person meeting five criteria there listed, of which the most important is that the person must have been physically present in the state, with certain exceptions, for one year.[2]

The law was not seriously enforced until 1975, when the state department of labor began issuing residency cards to those who met the statutory standards, and dispatching to pipeline jobs only persons with cards. This suit was filed shortly thereafter.

The eight plaintiffs, appellants here, include non-residents (some of whom have worked on the oil pipeline in the past), persons who have been residents less than one year, and a life-long resident who is not considered a resident for Alaska Hire purposes since he was out of the state for

---

1. The number of jobs covered by the law varies with the number and size of petroleum and pipeline projects in progress. In June 1976, the commissioner of labor testified that it applied to about 12,000 jobs, approximately 6 percent of the total employment in the state.

    Alaska Hire applies to the oil pipeline now in the final stages of construction. It will apply to any natural gas pipeline. Should any oil and gas leases ever be renegotiated, it will apply to them. It will apply to offshore oil and gas development under state leases. The present North Slope oil and gas leases are not covered since they were entered into prior to July 7, 1972, the effective date of AS 38.40. *See* AS 38.40.050(a).

2. AS 38.40.090(1) reads:
    " 'resident' means a person who
    (A) except for brief intervals, military service, attendance at an educational or training institution, or for absences for good cause, is physically present in the state for a period of one year immediately before the time his status is determined;
    (B) maintains a place of residence in the state;
    (C) has established residency for voting purposes in the state;
    (D) has not, within the period of required residency, claimed residency in another state; and
    (E) shows by all attending circumstances that his intent is to make Alaska his permanent residence."

several months last year. The defendants and appellees are Edmund Orbeck, commissioner of labor, and Guy Richard Martin, commissioner of natural resources. They will be referred to as "the state."

The plaintiffs make two major arguments: that the one-year durational residency requirement violates the state and federal equal protection clauses, and that any residency requirement violates the privileges and immunities clause of Article IV of the United States Constitution.[3]

By consent of the parties, consideration of the motion for preliminary injunction and of the merits was consolidated. The case was submitted on affidavits, depositions, and memoranda of law. No oral testimony was taken. On July 21, 1976, the superior court upheld the law in its entirety and entered judgment in favor of the defendant state officials. This appeal was filed the following day.

Preliminarily, the state asserts that the plaintiffs are not entitled to bring this suit because they lack standing and failed to exhaust their administrative remedies. We find these contentions without merit.

■ Five of the plaintiffs have sworn under oath that they are not residents of Alaska. Under AS 38.40.090(1)(D), they are not eligible to receive residency cards, and, since the department of labor cannot waive the statutory criteria, pursuit of administrative remedies would be useless. See *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522, 538–39 (1975); *Pence v. Morton*, 391 F.Supp. 1021, 1025 n. 3 (D.Alaska 1975), *rev'd on other grounds* (and this holding approved), 529 F.2d 135, 143 (9th Cir. 1976). Therefore, they have standing to challenge the residency requirement.

■ Plaintiffs Browning and Dorman are residents who have not lived in Alaska for one continuous year. Under the statute, they are ineligible for residency cards, and administrative remedies could not make them eligible. They therefore have standing to challenge the one-year residency requirement.[4]

■ Browning and Dorman executed their affidavits in May 1976. Since the preparation of the record on appeal, they may have met the one-year residency requirement. If so, the case is technically moot as to them. Nevertheless, we will address their contentions as though they were not moot, under the recognized exception to the mootness doctrine for cases "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911); *see e. g., Dunn v. Blumstein*, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998 n. 2, 31 L.Ed.2d 274, 279 n. 2 (1972); *Doe v. State*, 487 P.2d 47, 53–54 (Alaska 1971). Challenges to one-year residency requirements can seldom be pursued through both trial and appellate stages within the one year in which a given plaintiff is aggrieved. Yet there will always be others who have been residents for less than one year. If we required one of them to begin a new suit, it would probably be moot before appellate review could be obtained. There would never be a decision on the merits.

## II

■ Durational residence requirements are subject to strict scrutiny under the equal protection clauses of the federal and state constitutions because they penalize those who have exercised their fundamental right of interstate migration.[5]  *Memorial*

---

3. We agree with the trial court that the plaintiffs/appellants have abandoned their third, fourth, and fifth causes of action, under the due process, eminent domain, and ex post facto clauses. See *Maloney v. Brandt*, 123 F.2d 779, 782 (7th Cir. 1941); *Lewis v. State*, 469 P.2d 689, 691–92 n. 2 (Alaska 1970). We therefore do not consider them.

4. Since the other plaintiffs have standing to seek all the relief requested, we find it unnecessary to consider whether plaintiff Hicklin was properly made a party to this suit, whether he has standing, and whether he should have pursued administrative remedies.

5. The phrase "right to travel" is often used. But in cases challenging durational residency

*Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (non-emergency medical care at public expense, 1 year); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (voting, 1 year); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (welfare benefits, 1 year); *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974) (legislative candidacy, 3 years, upheld); *State v. Adams,* 522 P.2d 1125 (Alaska 1974) (divorce, 1 year); *State v. Wylie,* 516 P.2d 142 (Alaska 1973) (public employment, 1 year); *State v. Van Dort,* 502 P.2d 453 (Alaska 1972) (voting, 75 days).

▆▆▆ Under strict scrutiny, the law must be struck down unless the state can demonstrate that it is necessary to further a compelling state interest, and is the least drastic means available to further that interest. *Dunn v. Blumstein, supra,* 405 U.S. at 342–43, 92 S.Ct. at 1003–04, 31 L.Ed.2d at 284–85.[6]

In its two most recent durational residency cases, the United States Supreme Court has abandoned this standard. *Maricopa, supra* (striking down a 1-year requirement for non-emergency medical care at public expense); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (upholding a 1-year requirement for divorce). In *Maricopa* the Court was concerned with the nature of the public benefit withheld during the waiting period, stating that a durational residency requirement will be struck down only if it penalizes the right of migration by depriving the recent migrant of a basic necessity of life. This was not enunciated in *Sosna* although it is not entirely plausible explanation for *Sosna* as well. It

has been criticized from a variety of viewpoints. *See, e. g., Maricopa, supra,* 415 U.S. at 284–88, 94 S.Ct. at 1094–97, 39 L.Ed.2d at 329–32 (Rehnquist, J., dissenting); Barrett, Judicial Supervision of Legislative Classifications—A More Modest Role for Equal Protection?, 1976 *B.Y.U.L.Rev.* 89, 118–20; Comment, A Strict Scrutiny of the Right to Travel, 22 *U.C.L.A.L.Rev.* 1129 (1975).

We have never used this "basic necessities" reasoning. *See generally* Comment, Durational Residency Requirements: The Alaskan Experience, 6 *U.C.L.A.–Alaska L.Rev.* 50 (1976). On the other hand, our use of strict scrutiny has not always resulted in holding challenged laws unconstitutional. In *Gilbert v. State, supra,* we upheld the 3-year residency requirement for members of the legislature imposed by Article II, section 2 of the Alaska Constitution. We held that it was the least restrictive means available to further the compelling state interests in having the voters familiar with their legislators, and legislators familiar with the state and its problems.

With that background, we proceed to subject the Alaska Hire law to strict scrutiny. The principal precedent is *State v. Wylie,. supra,* in which we held unanimously that the state could not give a preference in public employment to persons who had lived in Alaska for a year before applying.

The interests which the state seeks to further through the Alaska Hire law are similar to those which were claimed to be "compelling" in *Wylie.* They are set forth in AS 38.40.010 and .020.[7] Through Alaska

**6.** This is a question of law, not one of fact. On appeal we examine it de novo. *Drope v. Missouri,* 420 U.S. 162, 174–75 & n. 10, 95 S.Ct. 896, 905–906 & n. 10, 43 L.Ed.2d 103, 115 & n. 10 (1975); *Fortin v. Darlington Little League, Inc.,* 514 F.2d 344, 348–49 (1st Cir. 1975). If the rule were to the contrary, a trial court decision upholding a law would preclude us from engaging in strict scrutiny unless we considered the decision clearly erroneous.

**7.** These sections read:
"Sec. 38.40.010. State policy. It is the policy of the state in the development of its natural resources to seek and accomplish the

requirements, the right at stake is to travel into a different state and make one's home there, not merely to travel. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 255, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306, 313 (1974).

This right nowhere appears in the black letter of the United States Constitution, although it did appear in the Articles of Confederation. *United States v. Guest,* 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239, 249 (1964). Nevertheless, it can no longer be disputed that it is a fundamental right calling for strict scrutiny. *Shapiro v. Thompson,* 394 U.S. 618, 629–31, 89 S.Ct. 1322, 1328–30, 22 L.Ed.2d 600, 612–13 (1969).

Hire, the state seeks to reduce the high unemployment rate for Alaska residents, and to use the extraction of Alaska's natural resources as an opportunity to cultivate its human resources.[8] Reducing unemployment, the state said in *Wylie*, was also the goal of a durational residency requirement for civil servants.

In *Wylie*, we found that a durational residency requirement for civil servants was not the least drastic means to further this governmental interest. 516 P.2d at 149. Indeed, we seriously questioned whether it furthered that interest at all. Unemployment in Alaska, we noted, is caused in large part by lack of education and vocational training, and there are few jobs—public or private—in rural areas where unemployment is highest. The durational residency requirement did not increase the number of jobs, nor did it necessarily hold down immigration into the state. *Id.* Job training, we suggested, would probably be a more effective way to reduce unemployment, and would not discriminate against recent migrants. *Id.* at 149 n. 14.

The superior court found that each of these concerns of *Wylie* is met by AS 38.40 and the manner in which the state has implemented it. Pipeline jobs are mostly in the rural areas and workers are not required to permanently relocate themselves and their families to their place of employment. The workers are fed and housed by their employers and they are able to return to their homes and families during vacation periods. On the other hand, workers are dispatched to many such jobs from union halls in Fairbanks or Anchorage.

The state initiated a training program for unskilled Alaskans with commencement of pipeline construction. It is necessary, the state argues, that the trainees have some guarantee that jobs will be awaiting them if they are to make the commitment of time and effort necessary to leave their rural homes to enter and complete a job training program.

Unlike the situation in *Wylie*, most of the projects covered by Alaska Hire are and will be of a "boom," short-durational nature. If a trainee is to apply the benefits of his training by getting a job on such a project, he cannot be made to wait until all new arrivals, who may be in a more job-competitive position, have been hired. The project would be completed before that happened.

To state the differences between the facts of this case and *Wylie* is not to decide the issue. There are countervailing considerations.

The extent to which the Alaska Hire Law in fact benefits unemployed Alaskans and those in job training is questionable. Alaska Hire does not distinguish among those who have been one-year residents; it gives all of them an absolute preference over those who are not one-year residents. A lifelong Alaskan employed in a private business or the public sector would be entitled to preference under Alaska Hire if he sought a new job. An unemployed person, or one who had just completed a private or public training course qualifying him for pipeline or petroleum employment, but who

development of its human resources by providing maximum employment opportunities for its residents in conjunction with natural resource management.

"Sec. 38.40.020. Legislative findings. The legislature finds that Alaska has a uniquely high unemployment record among the states due both to cultural and geographical migration barriers which record has existed for many years and which experts have attested will persist without drastic governmental intervention. The legislature further finds that employment opportunities which from time to time occur in the areas of the state suffering from the largest chronic unemployment problem are nonrecurring and usually relate

to the exploitation of the state's natural resources and that the state has an obligation to assure that the benefits of this employment enure to the residents of the state."

8. Article VIII, section 2 of the Constitution of Alaska reads:

"The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, *for the maximum benefit of its people.*" (Emphasis added.) The section is not limited to those of Alaska's people who have been here for at least twelve months.

had taken an extended trip outside the state eleven months earlier, would be unable to obtain preference.[9]

While under strict scrutiny the correlation between the classification made by the statute and the goals sought to be achieved need not be perfect, it must be sufficiently strong that the classification is the least drastic means to achieve those ends. We cannot say that a one-year durational residency requirement is the least drastic means available to the state in its quest for reduced unemployment and a stabilized economy. Therefore, we hold that AS 38.40.090(1)(A) violates the equal protection clauses of the federal and state constitutions.[10] The challengers point out that the least drastic, and also the most effective, means to help the unemployed and recent trainees to find jobs, is to give an employment preference only to the unemployed and recent trainees.

The state stresses an additional fact not present in *Wylie*. In the industries covered by Alaska Hire, there are pools of migratory skilled workers. When a project is complete, they tend not to remain in the area, but to travel to another major construction project or petroleum development elsewhere. Such persons, the state points out, often have a highly mobile lifestyle and in a very short time could acquire the indicia of Alaska residence—mailing address, voter registration, driver's license, auto registration. A durational residency requirement, and not merely a residency requirement, is needed, according to the state, in order to strengthen to local economy and labor force by giving preference to Alaskans who lived

here previously and are more likely to stay when the oil and gas project is completed. As we shall demonstrate later in this opinion, Alaska Hire is not invalid in its entirety, and there are steps Alaska can constitutionally take to insure that the preference goes only to *bona fide* residents. Our holding is merely that it sweeps too broadly to define *bona fide* residency so that no one may qualify until he or she has lived in Alaska for one year.

Nor do the cases upholding a one-year residency requirement for reduced public college tuition support the one-year requirement of Alaska Hire. Those requirements, like Alaska Hire, were enacted to deny the benefit to those who had become residents of the state only upon enrolling at the college. *Starns v. Malkerson*, 326 F.Supp. 234 (D.Minn.1970), *aff'd*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971); *Vlandis v. Kline*, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63, 72 (1973) (dictum). But Alaska Hire would resemble an absolute preference in enrollment for one-year residents, not a reduced tuition rate. Those cases do not support such an absolute preference, nor do any others.

The state also suggests that our scrutiny should be less strict because Alaska Hire does not bar non-residents from employment, but merely gives a preference to residents. But as long as there are available Alaska residents, it *is* a bar to those who cannot meet the residency standards. Be it bar or preference, the appellants have sought jobs on the pipeline, but have been unsuccessful because of the Alaska Hire

---

9. Plaintiff Hicklin was born in Alaska and has lived here all his life. He was denied a residency card because he had just returned from six and a half months in the state of Washington where he helped his father build a house.

10. The state offers as an alternative justification for Alaska Hire, in addition to its police power, the state's proprietary power over the resources it owns. The state asserts it is not subject to the equal protection clause in the management of its property. This is not the law. *State v. Wylie*, 516 P.2d 142, 146 (Alaska 1973), made it clear that the state in its capacity as *employer* must obey the Fourteenth

Amendment. The state as a trustee of property must obey the Fourteenth Amendment. *Pennsylvania v. Board of Directors of City Trusts*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). The Fourteenth Amendment applies equally to a state or city using the police power to regulate private businesses (*Turner v. City of Memphis*, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962) (racial segregation in restaurants) and using its proprietary powers to manage its own property (*Holmes v. City of Atlanta*, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), *vacating* 223 F.2d 93 (5th Cir.) (racial segregation of municipal golf courses).

law. A state labor official testified that about 74 percent of the pipeline work force meet the Alaska Hire residency requirements.

### III

The appellants also challenge the constitutionality of the remainder of the Alaska Hire law which, after AS 38.40.090(1)(A) is stricken, limits these petroleum and pipeline jobs to residents of Alaska. They allege that it violates both the equal protection and privileges and immunities clauses.

■ A residency requirement does not penalize the right of interstate migration, unlike a durational residency requirement, because it does not burden those who have recently migrated interstate. Hence it is not subject to strict scrutiny on that ground. See *McCarthy v. Philadelphia Civil Service Comm.*, 424 U.S. 645, 646–47, 96 S.Ct. 1154, 1155, 47 L.Ed.2d 366, 367–68 (1976); *Lynden Transport, Inc. v. State*, 532 P.2d 700, 706–07 (Alaska 1975).

■ Appellants ask that strict scrutiny be applied to the residency requirement because it infringes a claimed fundamental right to work. We have concluded, like the U.S. Supreme Court in *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976), that this is not a fundamental right calling for strict scrutiny.[11]

Article I, section 1 of our Constitution states that all people are entitled to "the enjoyment of the rewards of their own industry." That clause, and the indisputable truth that gainful employment is an economic necessity for most people, do not persuade us to apply strict scrutiny. In *Wylie*, notwithstanding that clause, we noted in dictum that the state could impose a residency requirement at the time of application upon applicants for public employment. 516 P.2d at 150 n. 15.

We are troubled by the possible ramifications of holding that the right to work is a fundamental right. Our statutes impose prerequisites of varying severity for licenses to pursue many occupations and professions. May the state, for example, require that professionals have graduated from accredited institutions of learning (*e. g.* AS 08.08.130(a)(4) & AS 08.80.110(3)) only if it can demonstrate to the court that this is the least drastic means to further a compelling state interest? What would be the fate under strict scrutiny of AS 23.40.110(b), which permits union shop or agency shop agreements for public employees? A "fundamental right" of the character suggested by the appellants might unduly constrict the legislature's ability to respond to perceived public needs, without any corresponding benefit to personal liberty or the public good.[12]

---

**11.** Three cases which are often cited for the existence of such a fundamental right can be explained on other grounds. *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131, 135 (1915), decided decades before the concept of strict scrutiny and multi-tier equal protection review was developed, and *Purdy & Fitzpatrick v. State*, 71 Cal.2d 566, 579, 79 Cal.Rptr. 77, 86, 456 P.2d 645, 654 (1969), both would merit strict scrutiny because the laws in question discriminated against aliens, a "suspect class." *Sail'er Inn, Inc. v. Kirby*, 5 Cal.3d 1, 17, 95 Cal.Rptr. 329, 339, 485 P.2d 529, 539 (1971), concerned a law which restricted employment opportunities on the basis of sex, a classification which a number of cases including *Sail'er Inn* have held justifies strict scrutiny regardless of the rights or privileges affected. The California Supreme Court, after *Purdy* and *Sail'er Inn*, refused to apply strict scrutiny to the laws establishing the qualifications for practicing medicine. *D'Amico v. Board of Medical Exam-*

*iners*, 11 Cal.3d 1, 23–24, 112 Cal.Rptr. 786, 799–800, 520 P.2d 10, 22–23 (1974).

**12.** The differences between rights which are "fundamental" and those which are not are analyzed at length in *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 98–110, 93 S.Ct. 1278, 1329–36, 36 L.Ed.2d 16, 81–88 (1973) (Marshall, J., dissenting), and *Developments in the Law—Equal Protection*, 82 *Harv.L.Rev.* 1065, 1127–31 (1969). Both Justice Marshall and the Harvard commentators reach the conclusion that rights are considered "fundamental" simply because they are believed to be more important than other personal or economic interests. 411 U.S. at 100, 93 S.Ct. at 1331, 36 L.Ed.2d at 82; 82 *Harv.L.Rev.* at 1128. A balancing of the state's interests and those of the individual is implicit. 411 U.S. at 108, 93 S.Ct. at 1335, 36 L.Ed.2d at 87; 82 *Harv.L.Rev.* at 1132.

Justice Marshall, citing his *San Antonio* dissent, dissented in *Mass. Board of Retirement v.*

■ Appellants' alternative argument for strict scrutiny of the residency requirement is that non-residents should be declared a suspect class under Alaska's Constitution and therefore entitled to the additional protection of strict scrutiny for laws which impose disabilities upon them. They base this argument on cases holding that aliens are a suspect class under the federal Constitution.[13] This argument is undercut by *Mathews v. Diaz*, 426 U.S. 67, 84–87, 96 S.Ct. 1883, 1893–95, 48 L.Ed.2d 478, 493–94 (1976), holding unanimously that alienage is a suspect classification only for state laws, not for federal laws. Alienage most obviously differs from non-residence in a state because of the difficult and time-consuming process required to become a U.S. citizen, as opposed to the ease with which a person can change his residence to a new state. In addition, the plenary power of the political branches of the federal government to exclude and control aliens has no equivalent in the state government, which cannot similarly exclude or control U.S. citizens resident in other states. *See id.* at 86 n. 26, 96 S.Ct. at 1894 n. 26, 48 L.Ed.2d at 493–94 n. 26.

We do not believe it would be reasonable to require a state to meet the exceedingly exacting standards of strict scrutiny on all the numerous occasions when it seeks to benefit its residents—those who pay its taxes and elect its officers—in preference to persons who reside elsewhere.

■ Since there is no ground for applying strict scrutiny to the residency requirement, we must use the lower standard of review. Under the state Constitution, the test is laid out in *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976): the classification must bear a fair and substantial relation to a permissible state interest. Under the federal Constitution, the test is much more deferential: the law is to be upheld if the legislature could have had any conceivable basis to believe that it furthered a permissible state interest. *E. g., City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

Since the distinction made by Alaska Hire between residents and non-residents bears a close correlation to the state's interest in providing economic benefit to residents, the subject of dispute is whether this interest is a permissible one for the state to promote. *See Lynden Transport, Inc. v. State*, 532 P.2d 700, 709–11 (Alaska 1975); Tussman and tenBroek, The Equal Protection of the Laws, 37 *Calif.L.Rev.* 341, 362–64 (1949); Developments in the Law—Equal Protection, 82 *Harv.L.Rev.* 1065, 1081 (1969). This is the subject of the privileges and immunities clause of Article IV of the United States Constitution, to which we now turn our attention.

■ Article IV, section 2, of the federal Constitution says that "The citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[14] The privileges and immunities clause is not an absolute; the standard of review is similar to that which we established in *Isakson v. Rickey, supra*, for equal protection review. *Compare Toomer v. Witsell*, 334 U.S. 385, 396, 68 S.Ct. 1156,

---

*Murgia, supra*. But he did not believe that the right to work was a fundamental right invoking strict scrutiny; he urged that laws infringing that right be tested by the standard used in cases such as *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). This is the standard we adopted in *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976). His objection was to the use of the extremely deferential standard of *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), which we no longer use in testing laws against the Alaska Constitution. 427 U.S. 307, 317–23, 96 S.Ct. 2563, 2568–71, 49 L.Ed.2d 520, 527–31.

**13.** *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (civil service);

*Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (welfare); *Takahashi v. Fish & Game Comm.*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (commercial fishing); *C. D. R. Enterprises, Ltd. v. Board of Education*, 412 F.Supp. 1164 (E.D.N.Y.1976), *aff'd*, 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977) (employment on public works). In all these cases, the state discriminated between resident citizens and resident aliens, not between residents (citizen or alien) and non-residents (citizen or alien).

**14.** Alaska's Constitution has no privileges and immunities clause.

1162, 92 L.Ed. 1460, 1471 (1948) *with Isakson, supra,* 550 P.2d at 362 (Alaska 1976). "Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures."

*Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471, quoted in *Lynden Transport, Inc. v. State,* 532 P.2d 700, 709 (Alaska 1975) (footnote omitted).[15]

The standard list of "privileges and immunities" is from the opinion of Mr. Justice Bushrod Washington, sitting on circuit in 1823, in *Corfield v. Coryell,* 6 Fed.Cas. 546, 551–52 (No. 3,230) (C.C.E.D.Pa.1823). It is, he said, limited to "those privileges and immunities which are, in their nature, fundamental."[16] It includes "[t]he right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise." In *Corfield,* a Pennsylvanian challenged a New Jersey law which limited commercial fishing for shellfish to local

fishermen. The law was upheld, on the ground that the fishery was the common property of all the people of New Jersey, and could be limited to them. *Accord, Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (game birds); *McCready v. Virginia,* 94 U.S. 391, 24 L.Ed. 248 (1877) (fish). *Corfield* thus set forth both the rule and the exception, both of which are relevant to this case.

These cases were distinguished in *Toomer, supra,* which struck down a prohibitively high license fee for out-of-state commercial fishermen.[17] The shrimp in *Toomer,* unlike the fish in inland waters involved in *McCready,* migrated along the coast of a number of states and could not be said to belong to any of them. 334 U.S. at 399–403, 68 S.Ct. at 1163–66, 92 L.Ed. at 1473–75.[18] The state's "ownership" is less of a legal fiction in this case than it is with respect to fish and game. Alaska Hire does not apply to all jobs in extractive industries, but only those on projects to which the state government has a contractual nexus. *See generally* Alleyne, Constitutional Restraints on the Preferential Hiring of Alaskan Residents for Oil Pipeline Construction, 2 *U.C.L.A.–Alaska L.Rev.* 1, 3–8 (1972).

*McCready v. Virginia, supra,* has been distinguished, but it has never been overruled. We have concluded that it states the principle applicable to the decision of this case. Article VIII, section 2 of the Alaska Constitution, stating that Alaska's natural resources shall be used and developed in ways that will benefit Alaska's people, is not inconsistent with the privileges and immunities clause. The natural re-

**15.** *Cf. In re Giffiths,* 413 U.S. 717, 722 n. 8, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910, 915 n. 8 (1973): "Discrimination or segregation [of aliens or non-white persons] for its own sake is not, of course, a constitutionally permissible purpose."

**16.** It is longer than the list of fundamental rights which invoke strict scrutiny under the equal protection clause.

**17.** *Accord, Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (striking down a similar law of the Territory of Alaska).

**18.** This issue is before the United States Supreme Court again this year. *Massachusetts v. Westcott, cert. granted* 429 U.S. 815, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976), *argued,* 45 U.S.L.W. 3504 (Jan. 17, 1977). *Westcott* concerns a state law limiting certain offshore fisheries to one-year residents. The Supreme Judicial Court of Massachusetts concluded that it violated the privileges and immunities clause, citing *Toomer. Commonwealth v. Westcott,* 344 N.E.2d 411 (Mass.1976).

sources of Alaska "belong" to Alaska and to Alaskans in a way that, in our federal system, Alaska's society and economy in general do not.

Appellants, of course, strenuously object to this line of reasoning. They correctly point out that, under *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) and *West v. Kansas Natural Gas Co.,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), Alaska could not allow the export of oil or gas only after all local needs were met. But these cases were decided under the commerce clause, not the privileges and immunities clause. One of the principal reasons the United States Constitution was written, to replace the old Articles of Confederation, was to make the United States a single economic unit, without barriers to interstate trade. *See generally H. P. Hood & Sons v. DuMond,* 336 U.S. 525, 530–39, 69 S.Ct. 657, 661–66, 93 L.Ed. 865, 870–75 (1949). Laws forbidding or burdening exports from a state, or imports into it, are inconsistent with that principle.

But no commerce clause claim is advanced against Alaska Hire. Accepting the premise that the United States has and should have one common economy, we do not accept the offered conclusion that the government of Alaska can never make benefits available to citizens of Alaska in preference to citizens of other states.

■ *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), does not compel a decision to the contrary. In *Edwards,* the Court held invalid a state law making it a crime to assist indigent non-residents to come into the state. In purpose and in effect, the law was a direct barrier to interstate travel and migration. Alaska Hire does not erect a barrier to interstate travel or migration. With the durational residence requirement stricken, it permits new as well as long-time residents to receive a preference. It gives the state's benefits to those who bear its burdens,

without placing any limitation on who may voluntarily assume those benefits and burdens.

■ We rely on the *McCready* "natural resources exception" to the privileges and immunities clause. The trial court, on the other hand, upheld the law on the ground that it was not economic protectionism for its own sake, and so fell within the "independent reasons" exception to the privileges and immunities clause articulated in the quotation from *Toomer, supra.* The trial judge referred to Alaska Hire as an attempt to solve "problems that may be typified as social, racial, educational, and economic." We are hesitant to classify Alaska Hire as something other than an attempt to strengthen the Alaskan economy. In *Baldwin v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032, 1038 (1935), a commerce clause case, the Supreme Court rejected an attempt to justify regulation of the price of imported milk by analogy to regulation of its purity, which would unquestionably be valid. We believe that the better alternative is to consider Alaska Hire an economic measure justified by the "natural resources exception," the principle that a state may prefer its residents in dealing with natural resources it owns.

IV

■ Appellants also challenge the constitutionality of the four indicia of residence other than duration listed in AS 38.-40.090(1): maintaining a place of residence in Alaska, residency for voting purposes, no claim of residency elsewhere, and an intent shown by all attending circumstances to be a permanent resident. We find no constitutional fault with any of them, and use our discussion of them to outline in some detail the standards which will govern determination of Alaska residence for the purposes of AS 38.40.[19]

---

**19.** *See* SLA 1972, ch. 191, § 2, part of the original Alaska Hire act:

"If a court of competent jurisdiction invalidates any of the criteria or tests of residency

in sec. 90 of this chapter, the term 'resident' then means a person who satisfies the remaining criteria or tests not invalidated, and

Maintaining a place of residence simply means being ordinarily physically present in Alaska, having a place within Alaska where one ordinarily stays, and having no such place anywhere else. The department of labor considers that a construction camp may meet this requirement.

Residency for voting purposes, under *State v. Van Dort,* 502 P.2d 453 (Alaska 1972), and AS 15.05.010(4) means durational residency for 30 days. In *Van Dort,* we found 30-day residency necessary to further the compelling state interest in preventing fraud and administering elections, and hence a constitutionally valid indicium of bona fide residence. The state does not construe this clause to require a worker either to register or to vote.[20] As in *Van Dort,* in order to determine bona fide residency *vel non,* this 30-day requirement is permissible.

The fourth criterion is that the worker may not claim residency anywhere else during the durational period. Since we have stricken the durational period, we interpret this to mean no claim of residency anywhere else at the time of application or thereafter. Since it is part of the concept of domicile (which is what bona fide residency means for these purposes)[21] that a person may have only one domicile at a time,[22] this is a reasonable requirement for determining bona fide residency.

Likewise, the fifth criterion, that the surrounding circumstances show an intent to make Alaska one's permanent home, is part of the definition of domicile, the intent to remain and not to go elsewhere.[23] "Permanent" does not require a promise to stay here forever. This indicium is no more subjective or vague than the concept of domicile itself.

■■■ The application form for a residency card asks for the following information covering the period of *two* years prior to application: all addresses where the applicant has lived; occasions on which the applicant has been physically outside Alaska, with reasons therefor; voting outside Alaska; claiming residency elsewhere "for any reason"; and all jobs held. Appellants conclude from this that the state department of labor has created a de facto two-year durational residency requirement. The only relevant testimony, that of David Finrow, is to the contrary. He said that evidence of attachment to another jurisdiction within the past two years is not grounds for automatic denial of a card, but that "a person's past practices sometimes indicate what his intentions are with regard to permanent Alaska residence." It goes to the second, fourth, and fifth criteria, not

this chapter shall be administered and enforced accordingly."

*See also* the severability clause of general application, AS 01.10.030.

**20.** The state official in charge of Alaska Hire testified, "we don't really consider voting too strongly . . . . [W]e don't give that criteria [sic] too much weight."

**21.** *See Vlandis v. Kline, supra,* 412 U.S. at 454, 93 S.Ct. at 2237, 37 L.Ed.2d at 72–73, and *State v. Adams, supra,* 522 P.2d at 1131–32, durational residency requirement cases using the terms "domicile" and "residence" interchangeably. *See also* Restatement (Second) of Conflict of Laws § 11, comment k (1971).

The fact that the state offers as a justification for Alaska Hire a desire to give these jobs to persons with relatively strong ties to the state, suggests that one of the lower standards of "residency" was not intended in place of the more stringent domicile standard.

AS 36.10.010 provides for an employment preference for state residents in the perform-

ance of construction contracts let by the state or a political subdivision of the state. A resident for purposes of AS 36.10, is defined at AS 36.95.010(5) as follows:

"(5) 'resident' means a person who maintains his domicile in the state: domicile is the true and permanent home of a person from which he has no present intention of removing and to which he intends to return whenever he is away."

*Ramey v. Rockefeller,* 348 F.Supp. 780, 788–89 (E.D.N.Y.1972) (3-judge court) (Friendly, J.), held that, at least for election purposes, a state may not define residence or domicile more strictly than the Second Restatement definition of domicile, and interpreted the requirement of "residence" in a state statute to be the same as the Second Restatement definition.

**22.** Restatement (Second) of Conflict of Laws § 11(2) (1971).

**23.** *Id.* § 18.

the first. This is in accord with the legal principle that evidence of domicile at an earlier time is evidence of domicile at a later time. 9 J. Wigmore, *Evidence* § 2530 (3d ed. 1940); C. McCormick, *Evidence* § 294 at 695–96 (2d ed. 1972) (statements of intent as to domicile are evidence of domicile at a later time also).

▇▇▇▇ Having concluded that the state may constitutionally give a preference to residents, we find nothing in any of these remaining criteria, or in the state's administration of them, that acts as an impermissible standard for determining residence. The state is constitutionally entitled to use reasonable administrative means to determine who is a bona fide resident and who is not. Domicile or bona fide residence contains an objective requirement of physical presence and a subjective intent requirement. It is not unreasonable to use the objective indicia listed in AS 38.40.090(1), other than the one-year requirement, to aid in determining whether an applicant has the subjective intent which is a necessary element of bona fide residence.

We note in particular that to be classified as a resident of Alaska, a person may not claim residence elsewhere. A person receiving any benefit from any other state on the basis of his residence in that state—e. g. voting, unemployment compensation, public assistance, "resident" tuition rate for unemancipated children, etc.—would not qualify. Likewise, once a person becomes an Alaska resident for this purpose, he becomes an Alaska resident for all purposes. For example, he must pay all taxes imposed upon residents by this state and the political subdivision in which he resides. He must register any motor vehicles in his possession with the Alaska department of motor vehicles. Failure to do so would be evidence that the person is not in fact a resident and not entitled to the preference.

Just as a person may register to vote less than 30 days after beginning to reside in Alaska, but may not vote until after 30 days have elapsed, so a person may apply for a residency card within the initial 30 days, but may not receive any preference in hiring during that 30-day period. As under the election laws, the 30-day period both serves administrative convenience and acts as an indicator of bona fide residence and intent to remain in Alaska.

V

In summary, we affirm the trial court's denial of relief, except with respect to AS 38.40.090(1)(A), imposing a one-year durational residency requirement, which we hold invalid as violating the equal protection clauses of the state and federal constitutions.

AFFIRMED IN PART AND REVERSED IN PART.

BOOCHEVER, C. J., with whom RABINOWITZ, J., joins, dissenting in part.

BOOCHEVER, Chief Justice, with whom RABINOWITZ, Justice, joins, dissenting in part.

AS 38.40.030 requires that all Alaskan oil and gas leases, easements or right-of-way permits for oil and gas pipelines and unitization agreements contain provisions requiring employment of Alaska residents. Only if qualified Alaska residents are unavailable, may others be employed. The provisions of the act apply also to all employment which is the result of oil and gas leases, easements, leases or right-of-way permits for oil or gas pipeline purposes and unitization agreements.[1] Thus, the act appears to include employment opportunities at refineries and in distribution systems utilizing oil and gas obtained under Alaska leases.

The majority opinion is based on an antiquated line of authority stemming from *Corfield v. Coryell*, 6 Fed.Cas. 546, 551–52 (No. 3,230) (C.C.E.D.Pa.1823), where a local state fishery was held to be the common property of the people of the state. *Accord, Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (game birds); *McCready v. Virginia*, 94 U.S. 391, 24 L.Ed.

1. AS 38.40.050.

248 (1876) (fish). Each of the cases cited by the majority deals with fish or game. *Corfield* limited commercial fishing for shellfish to local fishermen; *Geer* pertained to game birds and *McCready* restricted the planting of oysters in Virginia waters to Virginians.

The application of these cases has been severely limited by *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). There, the Court pointed out that *McCready* was its only prior decision upholding discrimination against commercial fishing or hunting by citizens of other states without advancing "persuasive independent reasons justifying the discrimination." The court refused to extend *McCready* beyond its facts and struck down a law whereby shrimp boats belonging to South Carolina residents were licensed for substantially lower fees than those of nonresidents.

*McCready* was distinguished on two grounds. First, the Court pointed out that, in contrast to the Virginia oysters, the South Carolina shrimp were free-swimming and migrating. Secondly, it emphasized that *McCready* involved regulation of inland waters while *Toomer* involved the marginal sea. Thus, casting serious doubt on the continued authority of *McCready,* it concluded:

These considerations lead us to the conclusion that the *McCready* exception to the privilege and immunity clause, *if such*

*it be,* should not be expanded to cover this case. (emphasis added) [2]

A rationale for state action more in keeping with the mobility of modern society was advanced:

The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States. (footnote omitted) [3]

The majority bases its holding on the theory that the natural resources of Alaska "belong" to Alaska and Alaskans. Under this rationale, it has been held that certain state resources may be restricted for state use.[4] But the law here in question is not aimed at restricting oil and gas use to Alaska.[5] In fact, the Alaska Pipeline has been constructed to the port of Valdez as a means of delivery of the oil to other states.

Even assuming *McCready* has continued viability,[6] however, ready distinctions here, as in *Toomer,* render that case inapplicable. We are not dealing with any proprietary interest of a state in its fish and game.

**2.** 334 U.S. at 402, 68 S.Ct. at 1165, 92 L.Ed. at 1474.

**3.** *Id.*

**4.** In *People v. Crane,* 214 N.Y. 154, 164, 108 N.E. 427, 430 (1915), then Judge Cardozo stated: "The state, in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens." The *Crane* decision was affirmed in *Crane v. New York,* 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915), which held that a state may give preference to its residents when using its funds on public works projects. *Accord, Heim v. McCall,* 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915); *People ex. rel. Holland v. Bleigh Constr. Co.,* 61 Ill.2d 258, 335 N.E.2d 469 (1975). *Crane* and *Heim* were held no longer to be controlling as applied to preference in state employment of United States citizens over aliens. *Sugarman v. Dougall,* 413 U.S. 634,

645, 93 S.Ct. 2842, 2849, 37 L.Ed.2d 853, 861 (1973). *See also C.D.R. v. Board of Education,* 412 F.Supp. 1164 (E.D.N.Y.1976), *affirmed,* 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977).

**5.** If the use of the resource were restricted to the state, serious constitutional questions would be involved. In *Pennsylvania v. West Virginia,* 262 U.S. 553, 581, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), it was held that an attempt by West Virginia to require preference in use of natural gas produced in that state to local consumers had the effect of withdrawing large quantities of gas from interstate markets and was an unconstitutional interference with interstate commerce.

**6.** *See* Justice Braucher's cogent opinion in *Commonwealth v. Westcott,* 344 N.E.2d 411 (Mass.1976).

Nor is the statute with which we are concerned limited to the extraction of oil located on state lands. The Alaska act goes must further and restricts nonresident employment not only in extraction of a natural resource, but also in the distribution or any other use resulting from its extraction.[7] In fact, employment on the pipeline involves construction of a distribution system rather than extraction of the oil. Moreover, the rationale behind the statute could be applied to all leases of state lands. Under the Alaska Statehood Act, Alaska was authorized to select in excess of 103,000,000 acres of land.[8] As a condition to utilizing the natural resources, whether by mining, agriculture or timber industry, provisions in the leases could require preferential hire of residents. Such provisions could specify a local preference in all employment resulting from the leases. Thus, nonresidents could be barred from dairy, agricultural, mining and lumber industries established on state lands, as well as from employment in any processing or manufacturing resulting therefrom. There is nothing in *McCready* to suggest that such a pervasive restriction of nonresident employment would be constitutionally permissible.

Certainly, Alaska has a major problem with unemployment. This problem is particularly acute in rural arctic communities which are faced with the inexorable change from their historic reliance on fish and game for subsistence. Hopefully, by means of valid enlightened legislation such as the Alaska Native Claims Settlement Act[9] and the initiative of community leaders, these concerns may properly be addressed.

In any event, preference for resident employees may not be upheld on the basis of the economic benefits derived by the state. If economic benefits to residents could justify discrimination, the privileges and immunities clause of the United States Constitution would become meaningless. It was for that reason that we held in *Lynden Transport, Inc. v. State*, 532 P.2d 700, 711 (Alaska 1975):

> Benefiting economic interests of residents over nonresidents is not a purpose which may constitutionally vindicate discriminating legislation, . . . .

While Alaska's problem is unique in its specific setting, other states either presently or in the past have confronted similar economic problems.[10] It takes little imagination to see that if Alaska's local hire law is constitutional because of economic benefits to its residents, each state could justify restricting to its own residents not only the utilization of its lands and natural resources, but also employment resulting from such use.

In my opinion, the local hire statute runs afoul of the concept of federalism. In *The Federalist*, John Jay, Alexander Hamilton and James Madison wrote eloquently of the importance of our being one nation with citizens enjoying the same rights, privileges and protection.[11] These principles were

7. AS 38.40.050.

8. Alaska Statehood Act, P.L. 85–508, 72 Stat. 339 (July 7, 1958) Sec. 6.

9. P.L. 92–203, 85 Stat. 688, 43 U.S.C. § 1601 *et seq.* (Dec. 18, 1971).

10. For example, New York state has encountered unemployment and substandard living conditions resulting from waves of migrants to New York City. The vast automobile industry of Michigan is subject to periodic upheavals causing massive unemployment. The exodus of industry from the New England states presents them with equally valid economic reasons for favoring residential employment. California at one time sought to keep out nonresident indigents. In *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), a law making it a criminal offense to bring or assist in bringing an indigent nonresident into California was held invalid by a unanimous Court. Five justices based their decision on the Commerce Clause. Justice Douglas, speaking for three members of the Court, based his decision on the right of persons to move freely from state to state. He held that the law violated the fourteenth amendment privileges and immunities clause protecting privileges and immunities of national citizenship against state interference. Justice Jackson took a similar approach.

11. *The Federalist*, No. 2 (J. Jay) p. 94 (Wright, ed. 1972):

> To all general purposes we have uniformly been one people; each individual citizen

echoed by Justice Cardozo in *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032, 1038 (1935).[12]

In *Toomer,* Chief Justice Vinson spoke of the privileges and immunities clause in terms of a like philosophy:

> The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy. For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation. Indeed, without some provisions of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which

now exists. *Paul v. Virginia,* 8 Wall (U.S.) 168, 180, 19 L.Ed. 357, 360 (1868).

In line with this underlying purpose, it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State. 334 U.S. at 395–96, 68 S.Ct. at 1162, 92 L.Ed.2d at 1471.

If local hire is valid and each state may restrict to its own residents not only the utilization of its land and natural resources but also employment resulting from such use, then the concept of federalism would be effectively extinguished. Each state would become a separate and isolated enclave. I cannot believe that the Framers intended such a result and therefore conclude that the local hire statute is unconstitutional.[13]

everywhere enjoying the same national rights, privileges, and protection.
*The Federalist,* No. 22 (A. Hamilton) p. 192 (Wright, ed. 1972):

> 'The commerce of the German empire is in continual trammels from the multiplicity of the duties which the several princes and states exact upon the mechandises passing through their territories, by means of which the fine streams and navigable rivers with which Germany is so happily watered are rendered almost useless.' Though the genius of the people of this country might never permit this description to be strictly applicable to us, yet we may reasonably expect, from the gradual conflicts of State regulations, that the citizens of each would at length come to be considered and treated by the others in no better light than that of foreigners and aliens.

*See also The Federalist,* No. 42 (J. Madison) (Wright, ed. 1972).

**12.** Rejecting the contention that New York could apply its laws for the purposes of economic protection of its dairy industry against out-of-state milk producers, he stated:

> To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the do-

minion of a political philosophy less parochial in range. It was framed upon the theory that the people of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.

**13.** In *Douglas v. Seacoast Products, Inc.,* —— U.S. ——, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), the United States Supreme Court has reiterated the concept of federalism in striking down, primarily on the basis of federal pre-emption and the Supremacy Clause, a Virginia law prohibiting federally licensed vessels owned by nonresidents of Virginia from fishing in Chesapeake Bay. In condemning such restrictive laws, the Court stated:

> Each State's fishermen eventually might be effectively limited to working in the territorial waters of their residence, or in the federally controlled fishery beyond the three-mile limit. Such proliferation of residency requirements for commercial fishermen would create precisely the sort of Balkanization of interstate commercial activity which the Constitution was intended to prevent. —— U.S. at ——, 97 S.Ct. at 1752. (footnotes omitted, citations omitted)