Thomas WILLIAMS, Commissioner of Revenue, and State of Alaska, Appellants and Cross–Appellees,

v.

Ronald M. ZOBEL and Patricia L. Zobel, husband and wife, Appellees and Cross–Appellants.

Nos. 5400, 5421.

Supreme Court of Alaska.

Sept. 19, 1980.

See also, Alaska, 619 P.2d 448.

Susan Burke, Asst. Atty. Gen., Avrum M. Gross, Sp. Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellants.

Mark Sandberg, Camarot, Sandberg & Hunter, Anchorage, for appellees.

Robert C. Erwin, Erwin & Smith, Anchorage, for amicus curiae Kenai Peninsula Borough.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

DIMOND, Senior Justice.

During its 1980 session the Alaska legislature enacted two statutes, one pertaining to tax relief, and the other, to distribution of the state's oil wealth. The first enactment, AS 43.20.010–.100 (Ch. 21, SLA 1980), referred to as the Permanent Fund Statute, provides for a cash distribution of the income derived from the Alaska Permanent Fund[1] based upon the number of years an individual has been a resident of the state since 1959, the year that Alaska became a state.

The other statute, relating to the state income tax, completely exempts from taxation the income of those individuals who have filed an Alaska income tax return and

---

1. In 1977, the people of Alaska amended article IX, dealing with Finance and Taxation, of the Alaska Constitution, by adding section 15, which reads as follows:

    *Alaska Permanent Fund.* At least twenty-five per cent of all mineral lease rentals, royalties, royalty sale proceeds, federal mineral revenue sharing payments and bonuses received by the State shall be placed in a permanent fund, the principal of which shall be used only for those income–producing investments specifically designated by law as eligible for permanent fund investments. All income from the permanent fund shall be deposited in the general fund unless otherwise provided by law.

reported gross income from sources within Alaska for three or more years. AS 43.20.017 (Ch. 22, SLA 1980).

The Zobels, both residents of the state since 1978, filed suit against the state in superior court on April 28, 1980, seeking a declaration that both statutes were unconstitutional and an injunction prohibiting their enforcement. After extensive briefing on both sides, the superior court held a hearing on a motion for summary judgment on June 12, 1980, and issued a memorandum decision on June 27, 1980. The judge concluded that both statutes were unconstitutional because they denied the Zobels their right to equal treatment under the Alaska Constitution.[2] Both sides appealed.

On September 4, 1980, we issued an order affirming that portion of the superior court's decision which invalidated the income tax statute and indicated that an opinion would follow. In the order we reserved consideration of that portion of the superior court's judgment which pertained to the permanent fund distribution system. This opinion accordingly addresses only the tax statute.

## I. The Income Tax Exemption Statute.

■ The principal subsections of the tax exemption statute that are in dispute are AS 43.20.017(a) through (c), which are set forth in the margin.[3] Those individuals who have filed income tax returns reporting income from Alaska sources for the past three years are immediately exempt from

paying any further state personal income taxes. Those who have filed tax returns in two previous years are exempt from two—thirds of the tax that would ordinarily be levied under the existing tax structure, and those that have filed in one previous year are exempt from one–third of their tax.

The state argues that the system of exemptions falls equally on residents, nonresidents, shorter term Alaskan residents and longer term residents. At oral argument, and in its brief, the state argued at length that there is no evidence of purposeful discrimination against new residents created by the system of exemptions, and that any disproportionate impact the statute may have is incidental to the legislation's main objectives.

We think the state's argument is meritless. Regardless of the lack of evidence of purposeful discrimination, the effect of the statute will be that few long–term residents of Alaska will ever have to pay income taxes,[4] while anyone moving to Alaska will have to pay taxes for three years.

All Alaskans who have lived here and filed tax returns for more than three years will be exempt from the income tax. Younger long–term residents who file state income tax returns for earnings from summer and part–time jobs can satisfy the three–year exemption requirement by the time they enter the labor force as full–time employees.

2. Article I, section 1, of the Alaska Constitution provides in pertinent part:

    [A]ll persons are equal and entitled to equal rights, opportunities, and protection under the law; . . . .

3. AS 43.20.017 provides:

    *Individual Tax Exemptions.* (a) If an individual filed an Alaska net income tax return and reported gross income earned from sources in the state for three or more tax years preceding the tax year for which an exemption is claimed under this section, the *income of that individual is exempt from taxation* under this chapter in each succeeding tax year.

    (b) An individual is exempt from payment of two–thirds of the net income tax levied under this chapter if the individual filed an Alaska net income tax return and reported

gross income earned from sources in the state for two tax years preceding the tax year for which an exemption is claimed under this section.

    (c) An individual is exempt from payment of one–third of the net income tax levied under this chapter if the individual filed an Alaska net income tax return and reported gross income earned from sources in the state for one tax year preceding the tax year for which an exemption is claimed under this section.

4. The legislature was advised that the present statute would result in total exemption for about eighty per cent of Alaska's former taxpayers. House Debates on CCS for SB 122 and CCS for SB 394, April 15, 1980.

It is true that some nonresidents, such as fishermen who come to the state each year, will also be exempt under this statute. But we believe the pattern of the impact of the statutory scheme is so striking that it would be naive to assume that the statute does not place the principal burden of taxation on new residents. Contrary to what the state and the dissenters argue, discrimination against new residents created by the series of exemptions is apparent from the statute. Therefore, the legal question presented is whether Alaska may selectively impose an income tax on new residents.

The tax statute in effect imposes a durational period of residency before new residents are accorded tax–free status. In analyzing the Zobels' equal protection challenge, we must review those lines of cases which have considered durational residency requirements.

## II. Durational Residency Requirements under the United States and Alaska Constitutions.

Case law from the United States Supreme Court interpreting the United States Constitution in this area begins with *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), which struck down a one–year durational residency requirement as a condition for receiving welfare benefits. Since then, there have been a series of cases considering the validity of such requirements. Typically the analysis has focused on the equal protection clause of the fourteenth amendment of the United States Constitution and the constitutional right to travel.[5] The relationship between these two constitutional protections, which may not be immediately clear, is that a durational residency requirement does not treat equally those individuals who have recently exercised their constitutional right to travel and those who have not. Individuals who belong to that class of people who have recently migrated to a state are denied certain rights and benefits granted to other residents. In effect, the argument is that a

durational residency requirement impermissibly penalizes those who have exercised a constitutional right.

In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), Justice Marshall, who wrote the majority decision, suggested that any penalty on a group of people who have recently exercised the constitutional right to travel is impermissible. In response to the argument that some evidence of actual deterrence to travel need be shown, the opinion notes:

This view represents a fundamental misunderstanding of the law. It is irrelevant whether disenfranchisement or denial of welfare is the more potent deterrent to travel. Shapiro did not rest upon a finding that denial of welfare actually deterred travel. Nor have other "right to travel" cases in this Court always relied on the presence of actual deterrence.

405 U.S. at 339–40, 92 S.Ct. at 1001, 31 L.Ed.2d at 283 (footnotes omitted). Furthermore, the opinion concludes that because "[d]urational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right", such laws "must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are '*necessary* to promote a *compelling* governmental interest.'" 405 U.S. at 342, 92 S.Ct. at 1003, 31 L.Ed.2d at 284 (emphasis in original) (citations omitted).

The majority of the Supreme Court agreed in *Dunn* that the denial of the right to vote for one year was a significant enough penalty that the state would have to justify such a law by showing a counterbalancing compelling state interest. However, the view that this strict test must be used in evaluating *all* durational residency requirements has never commanded a majority of the Court. A year after *Dunn*, in *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Court noted in

**5.** *See, e. g., United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239, 249 (1966) ("freedom to travel throughout the

United States has long been recognized as a basic right under the constitution").

dictum that eligibility for reduced tuition at a state university could be premised on a durational residency requirement. In support of this conclusion, the Supreme Court cited in a footnote (*id.* at 452 n. 9, 93 S.Ct. at 2236 n. 9, 37 L.Ed.2d at 72 n. 9) its affirmance of *Starns v. Malkerson*, 326 F.Supp. 234 (D.C. Minn.1970), *aff'd*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971). In *Starns*, a three–judge district court had concluded that the University of Minnesota could condition payment of in-state tuition on a one–year durational requirement, and specifically rejected the use of the "strict scrutiny" equal protection analysis. 326 F.Supp. at 238.

The following year the Court considered the question of whether free medical care for indigents could be conditioned on a one-year residency requirement. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). The majority opinion, again authored by Justice Marshall, seems to retreat from the Court's earlier unequivocal position in *Dunn* that any durational residency requirement must be justified by a compelling state interest. The opinion suggests that durational residency requirements only impinge on the right to travel when such a requirement is used by a state to condition the right to receive "basic necessities of life" or a "fundamental political right." 415 U.S. at 259, 94 S.Ct. at 1082, 39 L.Ed.2d at 315. Only because the majority found that medical care was a basic necessity of life did it conclude that a compelling state interest had to be shown to justify the requirement.

Finally, in 1975, the Court sustained an Iowa statute that conditioned divorce on one year of residency in the state. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Justices Marshall and Brennan noted in a dissenting opinion:

[t]he Court ... has not only declined to apply the "compelling interest" test to this case, it has conjured up possible justifications for the State's restriction in a manner much more akin to the lenient standard we have in the past applied in analyzing equal protection challenges to business regulations.

419 U.S. at 420, 95 S.Ct. at 568, 42 L.Ed.2d at 553 (citations omitted).

To summarize, in the federal courts it now appears that laws which deny or restrict certain benefits to new residents will only be subjected to strict scrutiny when they deny "basic necessities of life" or some "fundamental political right." In retrospect, one may question whether *Shapiro* and its progeny are "right to travel" cases at all, because denial of welfare benefits or political rights to any class of people, whether newly arrived migrants or some other class, would always seem to justify strict scrutiny.

A review of our durational residency cases can be easily summarized. We have never used anything but "strict scrutiny" equal protection analysis.[6] In *Hicklin v. Orbeck*, 565 P.2d 159 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), which was decided some two years after *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), we noted that "[w]e have never used this 'basic necessities' reasoning." 565 P.2d at 163. As recently as *Castner v. Homer*, 598 P.2d 953 (Alaska 1979), we used strict scrutiny to analyze a city ordinance imposing a one–year durational residency requirement on the right to run for an elective city office.

Although we found a compelling state interest, and sustained the ordinance in

---

**6.** *Castner v. City of Homer*, 598 P.2d 953 (Alaska 1979) (sustaining one–year durational residency requirement for right to run for city office); *Hicklin v. Orbeck*, 565 P.2d 159 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 57 L.Ed.2d 397 (1978) (no compelling interest in one–year waiting requirement to work on state oil and gas lease projects); *Gilbert v. State*, 526 P.2d 1131 (Alaska 1974) (compelling interest in three–year residency requirement for running

for state legislature); *State v. Adams*, 522 P.2d 1125 (Alaska 1974) (no compelling interest for imposing one year of residence to bring a divorce action); *State v. Wylie*, 516 P.2d 142 (Alaska 1973) (no compelling state interest to impose one–year requirement for civil service preference); *State v. Van Dort*, 502 P.2d 453 (Alaska 1972) (no compelling state interest in seventy–five–day voting requirement).

*Castner* (598 P.2d at 957), it is obvious that few durational residency requirements could withstand such an analysis. In light of our holding in *State v. Erickson*, 574 P.2d 1 (Alaska 1978), we believe that it is now appropriate to reexamine our conclusion, as expressed in our prior decisions, that all durational residency requirements must necessarily trigger the highest level of equal protection scrutiny.

In *Erickson*, we noted our prior dissatisfaction with the two–tiered model of equal protection used in federal constitutional analysis. We concluded that a single test would be more appropriate, and described the functioning of that test in the following terms:

Initially, we must look to the purpose of the statute, viewing the legislation as a whole, and the circumstances surrounding it. It must be determined that this purpose is legitimate, that it falls within the police power of the state. Examining the means used to accomplish the legislative objectives and the reasons advanced therefore, the court must then determine whether the means chosen substantially further the goals of the enactment. Finally, the state interest in the chosen means must be balanced against the nature of the constitutional right involved.

574 P.2d at 12 (footnotes omitted).

We noted that where federal constitutional questions were present which involved a suspect class or fundamental right, we would still be bound to use a test at least the equivalent in severity as the compelling governmental interest or strict scrutiny test used by the United States Supreme Court. When federal strict scrutiny was not required, however, we would be free to adopt our own test in gauging the importance of the right to equal treatment under the Alaska constitution. *Id.* at 11–12.

■ We conclude now that durational residency requirements should be measured against the test discussed in *Erickson*.

When a law conditions the receipt of some right or benefit upon a period of residency, we will balance the importance of the denial of the right or benefit against those legitimate government objectives which make it justifiable to classify people on the basis of their length of residency. As we stated in *Erickson*, a burden will be placed on the state to show that a classification "has a fair and substantial relation to a legitimate governmental objective," and that a greater or lesser burden to make such a showing will be based on the nature of the right or benefit involved. *State v. Erickson*, 574 P.2d 1, 11–12 (Alaska 1978).

■ Freedom from disparate taxation is not a federally protected fundamental right for the purpose of equal protection analysis under the fourteenth amendment.[7] Therefore, we shall analyze the tax law under our general standard of equal protection discussed above.

III. The Tax Exemption System under the Alaska Equal Protection Clause.

■ Under *Erickson*, the beginning of our analysis is an examination of the legitimacy of the purposes of the enactment. The statute does not contain a statement of purposes, but in its brief the state has summarized what it believes to be the purpose of a selective, rather than a total, repeal of the income tax law. We have rearranged and reworded the statement of purposes slightly from the text of the state's brief:

(1) the plan should keep the state's income tax audit and collection staff intact;

(2) the plan should not saddle individuals with an empty and burdensome annual filing requirement;

(3) the revenue collection bureaucracy should be in proportion in size and cost to the amount of revenue collected;

(4) the plan should not redistribute the income tax burden so that it falls only on the very highest income earners, but it

---

7. *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245, 1253 (1937) ("Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation").

should retain the existing progressive structure;

(5) the plan should not result in a "windfall" to persons who receive the protections, services and benefits provided by the state that are closely related to the earning of income, but who have never before contributed to the costs of providing those programs;

(6) the plan should not entirely relieve individuals of their obligation to help defray the costs of government.

The first three purposes relate to the administrative convenience of the Department of Revenue. The essence of the state's position seems to be that, by requiring only one particular class of people in the state to pay income taxes, it is possible to reduce the workload and size of the bureaucracy needed to process tax returns. We have recognized the validity of administrative convenience as a legislative purpose, *Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255, 1265–66 (Alaska 1980), but have given it little weight. Restricting the income tax to any narrow class of people, however arbitrarily it might be drawn, would achieve the same result of reducing the number of tax returns filed each year. For example, the income tax could be selectively imposed on those with social security numbers ending with an odd number. In a close case, administrative convenience might tip the balance in favor of the government, but standing alone this reason cannot justify selectively imposing a tax on new arrivals to the state.

The fourth reason advanced by the state is that the present statute furthers the purpose of maintaining a progressive tax structure. What the state means by this is the familiar concept that those earning larger incomes will be in higher tax brackets and will pay a greater proportion of their income in taxes than those earning less income. The new tax law does not achieve this objective. At best it will produce a

totally random tax rate, and at worst it will actually be regressive–forcing those with lower incomes to pay higher taxes.

Under the new tax system, the tax will only be progressive within a given exemption year class. For example, if one compares two new one–year residents, one who earns $10,000 in a tax year and the other who earns $50,000, it is obvious that the taxpayer earning $50,000 will pay more income tax, both in absolute terms, and as a proportion of income, than the person who earns $10,000. But if one looks at the income earning population at large in the state, this result will not follow. A three–year resident of the state who earns $50,000 will, because of the exemption scheme, pay no state income tax, while the person who has recently migrated and earns $10,000 will pay a full share. Thus the exact opposite of a progressive tax structure has been achieved by the present legislation.[8] We cannot accept this rationale for taxing new residents.

The essence of the state's fifth statement of purpose, as we understand it, is that, because former residents have had to pay income taxes for many years in the past, it would somehow not be "fair" to allow newcomers to escape this burden, even though the tax revenue itself may not be needed. If one were to accept the state's logic, it would lead to the absurd result that no tax could ever be completely repealed. The tax supposedly is needed today so that today's new residents can achieve parity with longer term residents. When today's new residents have achieved parity, future residents will be obliged to achieve parity with today's residents, ad infinitum, so that total repeal would always be "unfair" to the last preceding group that had achieved parity.

A far more serious criticism of this rationale for a tax is that discussed in *Shapiro v. Thompson*, 394 U.S. 618, 632–33, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600, 614 (1969). The Supreme Court noted that awarding bene-

---

**8.** The tax scheme may also operate in a regressive manner because new arrivals to the state are likely to be employed in lower paying jobs. Thus longer term residents who would be in

higher federal tax brackets would pay no state income tax, while those in lower brackets would pay the tax.

fits to new residents based upon their past tax contributions

> would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services. [Footnote omitted.]

While the Court in *Shapiro* was discussing the denial of welfare benefits, we think the same principle is applicable when forcing a state's new residents to bear a disproportionate tax burden. We believe that the reason the Supreme Court of the United States has indicated that it is not a "constitutionally permissible state objective," *Shapiro*, 394 U.S. at 633, 89 S.Ct. at 1330, 22 L.Ed.2d at 614, to apportion state benefits and services according to the past contributions of its citizenry, is that such a rationale logically could lead to pervasive and profound inequality in nearly all phases of a state's relationship with its citizens. That, in any event, is our view of the implications of the argument.

If we were to accept the state's argument, boroughs and cities in Alaska could begin granting tax exemptions in such a way that only newcomers would pay the costs of local government. Other states might decide to impose income tax surcharges on their new residents. Such a system would create a patchwork of tax havens for long term residents. Each time someone moved, he or she would face the prospect of "buying in" to a new community. Such a concept is more than an imaginary threat to the right to travel, and we conclude that it also violates our own constitutional right to equal treatment. We cannot accept the state's fifth statement of purpose as a legitimate goal of a state tax.

Finally, while we can accept the state's sixth reason for maintaining an income tax–that individuals should not be totally exempt from an obligation to help defray the costs of government–we conclude that this purpose can be achieved by means which do not discriminate against new residents. We therefore conclude that AS 43.-20.017(a)–(c) is unconstitutional.

The dissenting opinion argues at some length, with frequent citation to federal authority, that the statute is constitutionally acceptable. Because the tax statute is violative of the Alaska Constitution, we do not reach the question of whether it violates the federal constitution. We do note, though, that the privileges and immunities clause of article IV, section 2 of the United States Constitution is generally regarded as prohibiting discrimination against nonresidents on "fundamental" matters such as, under the classic formulation of the doctrine by Mr. Justice Washington, "taxes or impositions".[9] Under the privileges and immunities clause the United States Supreme Court has struck down two state tax schemes which are quite similar to Alaska's new statute. *See Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975), and *Travis v. Yale & Towne Manufacturing Co.*, 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920). Both cases involved tax systems which had the effect of taxing nonresident commuters at higher rates than residents. In New Hampshire, which does not have a state income tax, the effect of the law was to force commuters from the bordering states of Maine and Massachusetts to pay income taxes to New Hampshire, while New Hampshire residents paid nothing. Although Alaska does not have nonresident commuters, the state does have something close to it in the highly transient workforce that is associated with the military and large construction projects. These Supreme Court decisions cast serious doubt on the validity of the Alaska tax law on federal constitutional grounds as well.[10]

---

**9.** Mr. Justice Washington, on circuit in *Corfield v. Coryell*, 6 Fed.Cas. 546 (No. 3230) (C.C.E.D. Pa.1823).

**10.** The rationale of the *Travis* case has been cited to hold unconstitutional a San Francisco

We also notice in the *Travis* and *Austin* decisions the wariness the Supreme Court has shown for tax schemes that impose disproportionate burdens on those persons who cannot adequately represent themselves in the legislatures of the states. This is a problem that occurs not only when states tax nonresidents, but also when states attempt to levy taxes on entities of the federal government, whose interests are similarly unrepresented in state legislatures. In *M'Culloch v. Maryland*, 4 Wheat. 316, 17 U.S. 316, 428, 4 L.Ed. 579, 607 (1819), which considered the validity of a state tax on a federal bank, Chief Justice Marshall wrote:

> In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.... But the means employed by the government of the Union have no such security ....

The logic of *M'Culloch* is applicable here. Although it is true that new residents are technically represented in the legislature, as a practical matter their interests may not be adequately protected. It takes time to participate meaningfully in the political mainstream of a community. New residents are likely to be poorly organized and fragmented, which makes it too easy to impose on them "erroneous and oppressive taxation." *Id.* Furthermore, under article II, section 2, of the Alaska Constitution new residents must wait three years before they are eligible to run for election to the legislature—precisely the same period during which they must pay income taxes. For these reasons, we are not persuaded by the views expressed in the dissent.

The Zobels have cross–appealed, contending that declaring these sections of the income tax law invalid should result in the repeal of the personal income tax. They frame the issue correctly as, "Had the legislature known that this classification was impermissible, would it have repealed the tax for everyone, or would it have chosen to apply the tax across the board?" However, we disagree with their conclusion.

Here there are really two questions of severability: first, whether the prior filing requirement is severable from the tax exemption statute. If so, then the exemption would be effective without regard to the prior filing requirement—in effect, the exemption would swallow up the tax.

The second issue is whether the tax exemption statute, as a whole, is severable from the remainder of the state income tax code. If not, then the entire state income tax would fall.

The test to be applied is stated in *Lynden Transport, Inc. v. State*, 532 P.2d 700, 713 (Alaska 1975) (footnote omitted):

> The test for determining the severability of a statute is twofold. A provision will not be deemed severable "unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall."

■ We cannot sever the prior filing requirement from the tax exemption provision without substantially redrafting the statute. Without the phrases dealing with the prior filing requirement, the statute is meaningless. As such, we find that legal effect cannot be given to the tax exemption statute without the prior filing requirement, and thus the entire exemption provision must fall.

■ Nor do we agree that the invalidity of the exemption statute must invalidate the entire state income tax code. Eliminating all the language of the 1980 amendment leaves the tax code intelligible, and thus legal effect can be given to it without the invalid exemption provision. The question then turns to legislative intent.

The Zobels contend that, as the legislature has eliminated the income tax for the majority of Alaskans, total elimination conforms more closely to the legislative intent than total reinstatement and imposition of

city tax which discriminated against different classes of state residents. *See County of*

*Alameda v. City and County of San Francisco*, 19 Cal.App.3d 750, 97 Cal.Rptr. 175 (1971).

the income tax. For several reasons, we disagree. First, the entire code is preceded by a general severability clause, which expresses a general legislative intent in favor of severability, albeit a weak one. *See Lynden Transport, Inc. v. State*, 532 P.2d 700, 712–13 (Alaska 1975). Second, the permanent fund statute contains an explicit nonseverability clause, and the absence of such a clause in the tax exemption statute, enacted simultaneously, may indicate a legislative intent that the latter be severable. Last, the purposes put forward by the state indicate that the legislature may not have favored complete elimination of the income tax.

Because we hold the tax exemption statute severable from the entire state income tax code, sections 2, 3, 10, and 11 of chapter 22, SLA 1980, are not affected by this decision.

The judgment of the superior court insofar as it concerns the tax exemption statute, AS 43.20.017 (chapter 22, SLA 1980), is AFFIRMED.

## BOOCHEVER, J., not participating.

1. I agree with Justices Dimond and Matthews that the tax exemption statute would fall into the "rational basis" tier under the federal two-tier equal protection test. I also agree that our own state equal protection test as applied in the right-to-interstate-migration context in several prior cases [*Hicklin v. Orbeck*, 565 P.2d 159 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978); *Gilbert v. State*, 526 P.2d 1131 (Alaska 1974); *State v. Adams*, 522 P.2d 1125 (Alaska 1974); *State v. Wylie*, 516 P.2d 142 (Alaska 1973); *State v. Van Dort*, 502 P.2d 453 (Alaska 1972)] has been modified by *State v. Erickson*, 574 P.2d 1 (Alaska 1978), which announced the test which should be applied in equal protection cases.

The test we announced in *State v. Erickson*, 574 P.2d at 12, is essentially one of balancing. On the one hand, the court must assess (1) the legitimacy of the state purpose purportedly furthered by the provision, and (2) the extent to which the relationship between the end (the asserted purpose) and the means (the classification chosen) is fair and substantial. On the other hand, the court is to determine the nature and the extent of the infringement of individual rights allegedly caused by the classification. *Id.*

RABINOWITZ, Chief Justice, concurring.

I concur in the result reached by Justices Dimond and Matthews regarding the unconstitutionality of the tax exemption statute.[1]

### A. Nature and Extent of Infringement of Rights

The most significant dispute between the parties here is over the nature and extent of the right infringed.[2] The Zobels contend that the three-year prior filing requirement is essentially a "durational residency" requirement, thus triggering strict scrutiny and requiring a compelling state justification. The state insists that the requirement does not discourage exercise of the right to migrate.

In my view, the appropriate focus is whether, and to what extent, the operation of the statute will have the effect of *penalizing* United States citizens for exercising their constitutional right to migrate between states.[3] Although precise figures are lacking, the state has conceded that the exemption will have a differential impact

2. There is no need to decide the question of whether the right to interstate migration is protected under the state constitution as well as the federal constitution. *See* Alaska Const. art. I, § 21 ("The enumeration of rights in this constitution shall not impair or deny others retained by the people."). I note that the federal right itself has no explicit source. *Shapiro v. Thompson*, 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, 612 (1969) ("We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision.") (footnote omitted). Even assuming that the right to interstate migration is purely federal, I see no conceptual barrier to invoking the state equal protection clause to protect it.

3. I note that there is no necessity to find that the system actually deters travel; rather, the focus is on whether or not the classification system operates to penalize those persons who have exercised their constitutional right of interstate migration. *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 257–58, 94 S.Ct. 1076, 1081–1082, 39 L.Ed.2d 306, 314–15 (1974).

and I reach the same conclusion.[4] Proportionately, a new resident is much more likely than an old resident to be subjected to an income tax under this scheme.

The parties have devoted a significant portion of their arguments to the subject of the "intent" of the legislature in passing this enactment—*i. e.*, whether or not the statute was "intended" to discriminate against new residents. The notion that a plaintiff must show that a statute was "intended" to discriminate against a particular group is based on a line of United States Supreme Court cases dealing with racial discrimination: *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v.*

*Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[5]

Based on the considerations set forth in footnote five, I would not require such a showing when the effect of the legislation is shown—or is stipulated—to impact unequally on groups according to whether or not they have exercised their constitutional right of interstate migration. I would not make a showing of discriminatory intent a necessary condition of finding that a classification penalizes an individual's exercise of the constitutional right of interstate migration.

Both the nature and the extent of the infringement must be examined. Here, this

---

**4.** The state conceded below that more new residents would be paying the tax than old residents. Clearly, the appropriate comparison is not that of absolute numbers, but of ratios; but we can take judicial notice of the fact that the majority of the population in Alaska is constituted of "old residents," and thus, proportionately, a new resident is much more likely to be paying the income tax than an old resident.

**5.** This authority is not controlling for three reasons: first, it is based on federal equal protection law rather than state equal protection law. This court could choose to reject the *Washington v. Davis* approach, for state equal protection claims, even in cases of racially disproportionate impact.

In other contexts, we have held that a prima facie case of discrimination may be established by a showing of differential impact, as long as the individual can show that he or she is a victim of this differential impact. *See Brown v. Wood*, 575 P.2d 760, 768 (Alaska 1978), *modified*, 592 P.2d 1250 (Alaska 1979) (plaintiff showing that she is paid less than male colleagues for comparable work established a prima facie case of discrimination and thus shifted the burden to the employer to show that the difference in pay is based on other considerations); *compare Johnson v. State*, 607 P.2d 944, 947–48 (Alaska 1980) (adopting same approach in the area of alleged racial discrimination in sentencing, requiring a showing that the individual's sentence was probably higher than that which would have been imposed upon a defendant of a different race with a like criminal history who committed a similar offense). Here it is uncontested that the Zobels are prejudiced by the differential impact in this case.

Second, the authority deals with equal protection cases in the context of race, not equal protection in the context of classifications based on exercise of constitutional rights. I am not aware of any case which has required such a showing of "legislative intent" when the strict scrutiny standard is triggered, not by a racially disproportionate impact, but rather by a disproportionate impact on those who have or have not exercised certain constitutional rights; and there is some authority to the effect that *Washington v. Davis* and *Arlington Heights* are arguably "limited to equal protection claims involving alleged racial discrimination." *Socialist Workers Party v. Chicago Bd. of Election*, 433 F.Supp. 11, 14 n. 8 (N.D.Ill.), *aff'd and modified on other grounds*, 566 F.2d 586 (7th Cir. 1977) (per curiam) (adopting the district court opinion), *aff'd*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). Outside the equal protection context, there is authority to the effect that when an individual alleges that a particular administrative act (*e. g.*, a discharge, a criminal prosecution, etc.) is in retaliation for that individual's having exercised some constitutional right, he or she must show that his or her conduct was constitutionally protected, and that this conduct was a "substantial factor" or a "motivating factor" in the decision as to the administrative act; and *Washington v. Davis* and *Arlington Heights* have been cited as authority for this. *See, e. g., Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977). I do not find this apposite.

Third, even if this court followed *Washington v. Davis*, and chose to extend it to this area, the showing of intent is required to trigger the "strict scrutiny" analysis under federal law. Since I would not employ the "strict scrutiny" analysis under either federal or state law, I would not require a showing of intent as a necessary prerequisite to the *Erickson* approach.

translates into assessing exactly how the unequal impact "penalizes" the exercise of the right of interstate migration. I think that this tax can be properly characterized as an income tax levied only on an individual's first three years of contact with Alaska; or, as its differential impact is uncontested, a tax levied primarily on new residents. As such, I think that the scheme tends to penalize the exercise of an individual's right to migrate into Alaska in two ways. Its most obvious effect is the financial disincentive to enter: a new resident is subjected to three years of a tax burden which is considerably heavier, on an individual basis, than it would be were the same aggregate tax amount to be levied on new and old residents alike.[6] Secondly, it has a symbolic value which cannot be ignored. Whether or not the people of Alaska mean to do so, it projects to other United States citizens a marked hostility to new entrants by imposing a tax on them which is not imposed on long–term residents.[7]

Thus, I conclude that the differential impact on old and new residents effected by the exemption scheme clearly does penalize the exercise of an individual's right of interstate migration, in the manner noted above. As such, the state's purposes must be weightier, and the "fair and substantial relationship" between means and ends more narrowly drawn than if the statute did not penalize the exercise of the right of interstate migration (or if it penalized this to a lesser degree); but these concerns need not reach the level of being necessary to promote a compelling state interest, as we are not applying the "strict scrutiny" test.

## B. State Purposes and the Relationship Between These Purposes and the Classification

Having assessed the nature and extent of the right infringed upon, the next step under *Erickson* is to analyze the purposes of the statute and assess the extent to which the classification chosen has a "fair and substantial" relationship to these purposes.

The state advances six purposes for the tax exemption provisions:

(1) the plan should not relieve individuals entirely of their obligation to help defray the costs of government;

(2) the plan should not result in the total dismantling of the state's income tax audit and collection staff;

(3) the plan should not redistribute the income tax burden so that it falls only on the very highest income earners, but should retain the existing progressive structure;

(4) the plan should not saddle individuals with an empty and burdensome annual filing requirement;

(5) the plan should not result in a revenue collection bureaucracy out of proportion in size and cost to the amount of revenue collected; and

(6) the plan should not result in a "windfall" to persons who receive the protections, services and benefits provided by the state that are closely related to the earning of income, but who have never before contributed to the costs of providing those programs.[8]

It seems clear that purposes (2) through (5), although obviously legitimate state interests, are not related to the specific provision here at issue, the prior filing require-

---

6. It might be argued that there is no disincentive to entry because other states impose income taxes, and thus a prospective new resident is not any worse off in Alaska than he or she was in the state of origin. However, a showing of deterrence is unnecessary to a finding of infringement of the right of interstate migration. *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 257–58, 94 S.Ct. 1076, 1081–1082, 39 L.Ed.2d 306, 314–15 (1974). Additionally, not all states impose an income tax. State Tax Guide (P–H) ¶ 228 (1979).

7. There is also a possible argument that the statute creates a disincentive to long–term residents to move out of Alaska, thus dampening their exercise of the right to migrate. The Zobels do not complain that this aspect of the system is a factor in their own decision of whether to exercise the right of interstate migration.

8. The state goes on to explain that it is necessary only to recast these negative statements into positive ones to establish the actual purposes of the tax exemption plan.

**434**

ment. The Zobels do not contest the power of the state to reduce taxes, to maintain some tax system infrastructure, to maintain a progressive tax system, to reduce or eliminate the filing requirement, or to cut back on a disproportionately large tax bureaucracy. None of these, however, are "fairly and substantially related" to the line drawn by the legislature between those who have filed three, two, one, or no tax returns in the state. These purposes may explain why the legislature chose to reduce, without eliminating, the income tax requirement, but they shed no light on why the legislature chose to gear this reduction to a prior filing requirement, which is the question that must be answered.

A stronger case can be made for finding a relationship between the prior filing requirement and purposes (1) and (6). As I interpret the argument, the state contends that every resident of Alaska should, at some point in his or her income earning career, be subject to an income tax. Long-term residents have already been so subjected, as they have been liable for past taxes; and, to achieve some basic equity between that group and those first, second, and third-time filers who have not yet borne their share of the burden, this classification is required.

The Zobels assert that this purpose—the notion of introducing equity between old and new residents based on past tax contributions—is impermissible under the rulings of the United States Supreme Court. In *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court rejected a "past tax contributions" argument offered to justify a durational residency requirement for welfare benefits:

> [The state's] reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services.

394 U.S. at 632–33, 89 S.Ct. at 1330, 22 L.Ed.2d at 614 (footnote omitted). These same concerns were repeated in dicta in a footnote in *Vlandis v. Kline*, 412 U.S. 441, 450 n. 6, 93 S.Ct. 2230, 2235 n. 6, 37 L.Ed.2d 63, 70 n. 6 (1973).

The state argues that the Court did not say that past tax contributions could never legitimately form the basis for a statutory distinction; and that the equal protection issue raised by making distinctions based on past tax contributions does not turn on the legitimacy of the purpose, but rather on whether the distinction can be rationally related to the purposes of the statute. In *Shapiro*, such a distinction could not be rationally related to the purposes of the welfare statute, but it can be so related here.

I reject the Zobels' argument that distinctions based upon past tax contributions are absolutely impermissible. The Supreme Court's affirmance of *Starns v. Malkerson*, 326 F.Supp. 234 (D.Minn.1970), *aff'd*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), stands for the proposition that the Supreme Court has approved such a distinction between residents and nonresidents, based on former tax contributions, in the context of differential tuition charges as to resident and nonresident students. I think that, in some situations, a classification based on past tax contributions would be unquestionably permissible; *e. g.*, a tax rebate made retroactive for a reasonable period could not be struck down on the equal protection ground that it distinguished past taxpayers from past nontaxpayers based solely on past tax contributions (although I express no opinion as to the other grounds on which such a statute might be attacked).

On the other hand, it cannot be ignored that this "purpose" raises potential constitutional questions in many contexts, and is clearly impermissible in some (*e. g.*, welfare programs). I would resolve these conflicting considerations by ruling that distinctions based on past tax contributions are permissible, at least in the limited context of statutes designed to grant tax relief; but considering the possible constitutional in-

firmities with this purpose noted by the Supreme Court, this "purpose" must be placed among the weaker of the vast spectrum of state purposes, and normally it will not be given a great deal of weight when the *Erickson* balancing test is struck. Of course, this "weight" is only significant in relation to the other elements of the *Erickson* test. If the statute is tightly drawn so that there are no substantial gaps in the means/ends relationship, and so that its impact, in terms of "suspect classifications" and/or constitutional rights infringed, is minimal, then this purpose may prevail.

Having found the "purpose" legitimate in this limited context, I turn to an examination of the relationship between the means and the end here. The Zobels point out, and the superior court found significance in the fact, that the only requirement is that of having filed a return, not of having incurred tax liability. Thus, the relationship is not based on past tax contributions directly, but rather on past tax return filing. In effect, it is somewhat over–inclusive. The state is correct in pointing out that over–inclusiveness does not necessarily render a statute unconstitutional. *See Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255, 1267–68 (Alaska 1980). That is true; the over–inclusiveness is not dispositive. But it also is not irrelevant in assessing the extent to which the relationship between the classification and its purpose is a fair and substantial one.

### C. Striking the Balance

The final step in the *Erickson* approach, striking the balance, is not an easy task here. However, I find that the above analysis of the various elements to be weighed tips the scale in favor of the Zobels. This conclusion is reinforced by my reading of United States Supreme Court case law which has dealt, under privileges and immunities analysis, with other states' enactments of similar statutory exemption schemes.

These are the factors which I find weigh in favor of the Zobels: The statute does, as the state has admitted, have the effect of placing a disproportionate share of the tax burden on those who have recently exercised their right to migrate, and this, although not triggering the "strict scrutiny" approach, does constitute a substantial infringement of a well–established constitutional right. I think it can fairly be characterized as penalizing that right. The only proffered purpose which I find to be at all related to the distinction drawn here is that of establishing some rough notion of equity between former and future Alaskan taxpayers. This purpose is permissible in this limited context (*i. e.*, tax relief legislation), but it is not among the weightier of permissible state concerns. And considering that the relationship between means (the classification) and ends (establishing equity) is rendered somewhat less fair and substantial because the classification is not based on past tax liability, but rather on past filing of returns, I find that the balance comes out in favor of the Zobels.

In so ruling, I think it appropriate to derive guidance from the reasoning of the United States Supreme Court cases dealing with analogous problems in the privileges and immunities context. Generally, privileges and immunities analysis is applied to distinctions between residents and nonresidents, whereas distinctions between long–term and short–term residents are analyzed under the equal protection or due process clauses.[9] However, this court has recognized that privileges and immunities case law and reasoning may be helpful in assessing parallel equal protection claims. *Lynden Transport, Inc. v. State*, 532 P.2d 700, 706 (Alaska 1975). I find merit in the Zo-

---

**9.** This pattern does not always hold true. *See, e. g., Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 98 S.Ct. 1582, 56 L.Ed.2d 354 (1978) (both privileges and immunities grounds and equal protection grounds used in attack on distinction between residents and nonresidents).

As the Zobels here are residents of Alaska, they concede they have no standing to directly invoke the protection of the privileges and immunities clause. However, they contend that the reasoning in privileges and immunities cases is persuasive here.

bels' contention that a state probably has more authority generally to draw distinctions between residents and nonresidents than between two sets of bona fide residents based on length of residency.[10] Thus, cases striking down a distinction between residents and nonresidents are fairly persuasive authority for the proposition that that distinction cannot be drawn between long–term and short–term residents.

Two United States Supreme Court cases stand for the proposition that a state cannot place greater tax burdens on non–residents than on residents based solely on residency. In *Travis v. Yale & Towne Manufacturing Co.*, 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920), the Court found invalid a New York taxing system which, although it taxed residents and nonresidents at the same rate, granted New York residents some exemptions which were not available to nonresidents. Nonresidents were given a credit for taxes paid to their state of residence, and New York apparently thought that the state of residence would grant substantially equivalent personal exemptions, thus equalizing the tax burden between residents and nonresidents. However, some states, notably Connecticut and New Jersey, did not not have an income tax, and so of course residents of those states received neither the tax credits nor the exemptions. In effect, residents were granted exemptions which nonresidents were not. The Supreme Court had little difficulty striking this tax mechanism down:

> Whether [non–New York resident taxpayers] must pay a tax upon the first $1,000 or $2,000 of income, while their associates and competitors who reside in New York do not, makes a substantial difference. Under the circumstances as disclosed, we are unable to find adequate ground for the discrimination, and are constrained to hold that it is an unwarranted denial to the citizens of New York. This is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer, but a general rule, operating to the disadvantage of all nonresidents, including those who are citizens of the neighboring states, and favoring all residents, including those who are citizens of the taxing state.

252 U.S. at 80–81, 40 S.Ct. at 232, 64 L.Ed. at 470 (citations omitted).

In a more recent case, the Court struck down the New Hampshire Commuters Income Tax in *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). The statute in that case imposed a four per cent tax rate both on income which non–New Hampshire residents earned within the state and on income which New Hampshire residents earned outside the state. (Income which New Hampshire residents earned inside the state was not taxed.) Again, however, it was the exemption provisions which altered the impact of the tax. The income which New Hampshire residents earned outside the state was exempted in three situations: (1) if such income was taxed by the state from which it was derived; (2) if it was exempted from taxation by the state from which it was derived; or (3) if the state from which it was derived did not tax such income. In short, no resident of New Hampshire was taxed on his out–of–state income. Nonresidents were still taxed at four per cent or the rate at which the nonresident's home state would tax such income had it been earned in the home state, whichever was less. Again, the Court had little difficulty striking this scheme down, noting, "The overwhelming fact, as the State concedes, is that the tax falls exclusively on the income of nonresidents; . . . ." 420 U.S. at 665, 95 S.Ct. at 1197, 43 L.Ed.2d at 537–38.

---

**10.** A durational residency requirement, which draws a distinction between new and old residents based on the length of their residency, must be carefully distinguished from a residency requirement, which draws a distinction between residents and nonresidents. Generally, a state has much more authority to draw distinctions between residents and nonresidents than between long–term and short–term residents. *See Vlandis v. Kline*, 412 U.S. 441, 452–53, 93 S.Ct. 2230, 2236–2237, 37 L.Ed.2d 63, 72 (1973); *Fisher v. Reiser*, 610 F.2d 629, 635 (9th Cir. 1979).

I find these cases to be persuasive in reaching the conclusion that the exemption scheme in the case at bar cannot stand. If New York and New Hampshire cannot manipulate their tax exemption provisions to impact disproportionately on nonresidents, Alaska should not be able to follow this same course concerning newly arrived residents.

Finally, I agree with Justice Dimond on the severability issue presented by the cross–appeal–i. e., that the invalid portions of the statute (§§ 1 and 4–9) are severable, and §§ 2, 3, 10 and 11 may stand.

Based on these considerations, I agree that the judgment of the superior court as to the tax exemption statute should be affirmed.

CONNOR, Justice, with whom BURKE, Justice, joins, dissenting.

I dissent from the holding which declares Ch. 22 SLA 1980 invalid. My basic reasons are (1) in the case before us the right of interstate migration has not been infringed, (2) even if the tax exemption statute is viewed as imposing a durational residency requirement as a precondition of receiving the benefits of the statute, it does not amount to a penalty on interstate migration, (3) the statutory classification complies with the constitutional guarantee of equal protection of the laws under both the United States Constitution and the Alaska Constitution, and (4) in the field of taxation, legislative discretion is quite broad, and judicial review of taxation statutes should be correspondingly very limited.

### I.

The right of interstate migration has been recognized as basic or fundamental in decisions of both this court and the United States Supreme Court. However, the source of the right is unclear,[1] and its reach

is not absolute. Our concern here is only with the right to travel as it is affected by durational residency requirements, and whether such requirements must be invalidated as violating the equal protection provisions of the state and federal constitutions.

In relation to equal protection of the laws, the right has been applied to invalidate durational residency requirements in three leading federal cases. In *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the court struck down a one–year durational residency requirement which was a condition to qualifying for welfare benefits. The reasoning was that the residency requirement discriminated against persons who had recently exercised their right of interstate travel, that it amounted to a "penalty" on them, and thereby infringed a fundamental right. It subjected the requirement to strict scrutiny and found the justification wanting. The court was careful to point out that not all waiting periods would be unconstitutional, as they might either promote compelling state interests or might not amount to a penalty upon interstate travel. 394 U.S. at 638, n.21, 89 S.Ct. at 1333, n.21, 22 L.Ed.2d at 617, n.21.

In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the court struck down a one–year durational residency requirement for voting in state elections, applying a strict scrutiny standard. That case concerned both the right to vote and the right of interstate migration.

In *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the court invalidated an Arizona one–year durational residency requirement for eligibility for nonemergency medical care for indigents. The court there characterized the welfare benefits considered in

1. In *Oregon v. Mitchell*, 400 U.S. 112, 216, 91 S.Ct. 260, 310, 27 L.Ed.2d 272, 333 (1970), Harlan, J., dissenting in part, described the right as a "nebulous judicial construct."

Perhaps the best basis of the right is not that it flows from any particular constitutional provision, but that it is fundamental to a federal union. *Shapiro v. Thompson*, 394 U.S. 618, 629–30, 89 S.Ct. 1322, 1328–1329, 22 L.Ed.2d 600, 612–13 (1969); *United States v. Guest*, 383 U.S. 745, 757–58, 86 S.Ct. 1170, 1177–1178, 16 L.Ed.2d 239, 249 (1966). This gives the right an indefinite nature.

*Shapiro,* and the indigent medical care in Arizona, as "basic necessities of life," the denial of which should be subjected to strict scrutiny.

But other cases have demonstrated that not all durational residency requirements necessarily will be invalidated as infringing the right to travel and that they do not, therefore, require "strict scrutiny" under the equal protection clause. *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), *aff'd without opinion,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), and *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), permit states to charge higher university tuition fees to persons from out of state than to residents.[2]

Finally, in 1975, the court issued its opinion in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), in which it sustained a state one–year residency requirement as a prerequisite to filing for divorce. Nothing that Mrs. Sosna "was not irretrievably foreclosed from obtaining some part of what she sought," 419 U.S. at 406, 95 S.Ct. at 561, 42 L.Ed.2d at 544, the court held that the state's interest in assuring that those seeking divorce be genuinely attached to the state was sufficient to sustain the durational residency requirement. In other words, mere delay, rather than outright denial, did not amount to a "penalty" on interstate migration.

It is noteworthy that a number of commentators have viewed the *Shapiro* and *Maricopa* cases as having been improperly decided under either the equal protection clause or the right to travel. Professor Laurence H. Tribe views those cases as involving issues about welfare programs and poverty, and not the right to travel.[3] Professor Michael J. Perry does not think that the equal protection clause should even have been implicated in those decisions, and that it would have been enough to strike

down the statutes as simply interfering with the right of interstate migration.[4] In his separate opinion in *Maricopa,* Mr. Justice Douglas thought that invidious discrimination against the poor, not the right to travel, was the basis on which the statute should have been invalidated. 415 U.S. at 273–74, 94 S.Ct. at 1089–1090, 39 L.Ed.2d at 324.

In Alaska we have also treated durational residency requirements in a series of cases. In *State v. Van Dort,* 502 P.2d 453 (Alaska 1972), we struck down a 75–day durational residency requirement for voting eligibility. In *State v. Wylie,* 516 P.2d 142 (Alaska 1973), we applied a strict scrutiny standard and struck down a durational residency requirement of one year for preference in state personnel hiring. In *State v. Adams,* 522 P.2d 1125 (Alaska 1974), which was decided prior to the Supreme Court's decision in *Sosna v. Iowa, supra,* we invalidated a one–year durational residency requirement for filing a divorce action.

On the other hand, in *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974), we sustained a durational residency requirement of three years in the state and one year in the election district for candidates for legislative office. In that case we found that there was a "compelling state interest" in imposing such requirements, even under a strict scrutiny test. We later sustained a one–year durational residency requirement for candidacy for a city office, even under the strict scrutiny test, in *Castner v. City of Homer,* 598 P.2d 953 (Alaska 1979).

In *Hicklin v. Orbeck,* 565 P.2d 159 (Alaska 1977), *reversed on other grounds,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), we invalidated a durational residency requirement as a prerequisite to obtaining jobs on the Alaska pipeline project. We employed the strict scrutiny analysis which

---

**2.** In *Vlandis,* 412 U.S. at 452–53, 93 S.Ct. at 2236–2237, 37 L.Ed.2d at 72, the court invalidated an "irrebuttable presumption" of nonresidency on due process grounds, but still recognized that a state could, for equal protection purposes, validly distinguish between residents and nonresidents in setting tuition.

**3.** L. Tribe, American Constitutional Law 1003–05, 1118 (1978).

**4.** M. Perry, "Modern Equal Protection, A Conceptualization and Appraisal," 79 Colum.L.Rev. 1023, 1075 (1979).

we had used in *State v. Wylie, supra.* In dictum in *Hicklin*, we said, referring to the *Maricopa* case, *supra*, that, "[w]e have never used this 'basic necessities' reasoning." 565 P.2d at 163.

A cursory reading of the Alaska cases might suggest that all durational residency requirements will be subject to strict scrutiny, but two important factors suggest a contrary point of view. First, our earlier cases on durational residency were based on our initial perception of United States Supreme Court doctrine, which has proved to be inaccurate. The United States Supreme Court has not stricken down durational residency requirements since 1974, and certainly has not expanded the right to travel as some kind of primary, absolute right which automatically sweeps away any other governmental power or interest which stands in its way. Second, in *State v. Erickson*, 574 P.2d 1 (Alaska 1978), we abandoned the traditional two–tiered approach to equal protection analysis which had been employed in our earlier cases. We adopted the new single test for evaluating equal protection claims under the Alaska Constitution. The nature of the new test will be discussed below.

From the vantage point of today, as compared with several years ago, it can be said that the right to interstate migration, like all constitutional rights, must be weighed and balanced against other legitimate governmental interests, whether the weighing process takes place in defining the limits of the right or in applying other constitutional precepts such as due process and the equal protection of the laws. In assessing the claim of any general constitutional guarantee in a specific fact setting, it is necessary to consider the degree to which the claimed right is impaired, and to consider whether and to what extent that impairment is direct or indirect in its impact.

Thus, in determining claims that a state law has infringed the right to travel, we must consider the degree to which the requirement is likely to deter travel, whether its impact is direct or indirect, and the importance of the state's interests which are advanced by the law. Any other approach means a sterile application of rigid rules in situations which may vary widely in their factual and substantive content.

Seen in this light, our earlier decisions on such matters as voting rights and the right to seek employment are quite understandable. The right to vote has always been considered one of the freedoms most essential to the well being of our form of government, and our striking down of a durational residency requirement for voting in *State v. Van Dort, supra*, is quite in harmony with the similar action of the United States Supreme Court in *Dunn v. Blumstein, supra*. Similarly, the right to enter into a common occupation is deeply ingrained in our constitutional history. Therefore, it is not surprising that, whatever standards of scrutiny were used, durational residency requirements inhibiting that right should have been stricken down in *State v. Wylie* and *Hicklin v. Orbeck*. The case at bar, however, presents questions which are highly distinguishable from those which were presented in these cases of the past.

The Zobels argue that the tax exemption statute infringes their right to interstate migration. But the statute does not single out or penalize interstate migrants for treatment different from others who fall within the terms of the statute. The burden of paying state income tax falls equally upon all persons earning taxable income within the state, whether residents or not. The fact or length of such persons' residence is immaterial. This includes nonresidents who derive income from Alaska, persons who spend part of each year working in Alaska, but whose primary residence is elsewhere, and persons who have resided in Alaska for many years but who have only begun to earn income in Alaska during a three–year period before qualifying for exemption.

This statute cannot, therefore, be said to set up a durational residency requirement as a condition to receiving its benefits. Indeed, as previously noted, the statute contains *no* residency requirement. It is understandable that the superior court was

unable to conclude that any such requirement was imposed by this legislation.

Even if it is assumed that the statute does impose a durational residency requirement, the exemption is not a penalty on one's right to interstate migration. The United States Supreme Court outlined its view on what constituted a penalty in *Shapiro v. Thompson, supra*, and *Memorial Hospital v. Maricopa County, supra*. In both cases, the Court was concerned with the fear and risk the traveler would endure if he could not obtain welfare benefits or indigent nonemergency medical care upon initial establishment of residency in the state. *Maricopa*, 415 U.S. at 257–59, 94 S.Ct. at 1081–1082, 39 L.Ed.2d at 314–15. The Alaska tax exemption does not present a similar risk, nor does it, in any sense, constitute a penalty.

Moreover, as compared to the state of the previous law, Ch. 22 SLA 1980 can even be viewed as an *inducement* to migrate to Alaska, instead of a disincentive. Take, for example, the case of the Zobels compared to that of a person who moved to Alaska in 1965. Under the law as it existed in 1965, one could only look forward to paying taxes indefinitely and quite probably for the rest of his resident life here. By contrast, a person moving to Alaska under Ch. 22 SLA 1980 is assured that his individual state income tax will be decreased by one–third for each year of income–earning residence, and will be eliminated completely thereafter. The Zobels, in that respect, stand in a better position than a vast number of residents who preceded them to Alaska and who incurred tax liability over a period of many years.

Given that the tax does not fall on every new resident and does fall on some long time residents, it is difficult to view the exemption as a symbolic penalty on interstate migration. If the tax was constructed as a direct tax on each person beginning residence in the state, the symbolic penalty would be clear. Here, the symbolism is weakened considerably because the tax does not operate exclusively on new residents.

## II.

The remaining question is whether the legislation meets the requirement of reasonable classification which is mandated by the equal protection clause of the Alaska Constitution. As to this subject, we have held that a classification will be analyzed in terms of the legislative purposes of the enactment and the means chosen to further those purposes.[5] If the purposes are legitimate and the classifications or means chosen reasonably further those purposes, the statute is valid. In explicating the manner in which we should judge the reasonableness of the means or classifications chosen by the legislature, we have also stated the test as whether the classification is "reasonable, not arbitrary" and whether it rests "upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976).

Our adoption of this test, sometimes referred to as an "intermediate" test or an "intensified scrutiny" test, occurred because of dissatisfaction with the manner in which legislative classification had been treated in the federal system under the equal protection clause of the United States Constitution. There was nothing basically wrong with the verbal formulation of the federal "two–tiered" test. Rather, as is often the case in the judicial application of standards stated as generalities, the problem was with the way in which the test was applied in specific instances. The criticism leveled against the federal methodology was that it preordained the result in an unreflective manner. If the subject matter of the test required "strict scrutiny," the burden of showing that the legislation furthered a "compelling state interest" was so overwhelming that the legislation was almost

---

5. *Hilbers v. Municipality of Anchorage*, 611 P.2d 31 (Alaska 1980); *Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255 (Alaska 1980); *State v. Erickson*, 574 P.2d 1 (Alaska 1978); *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976).

automatically invalidated. But if the legislation did not affect fundamental rights or employ a "suspect classification" and, therefore, was subjected to the "rational basis" standard of review, the federal courts often were willing to resort to conjectural or hypothetical purposes (as contrasted with the legislature's actual purposes) in finding that the basis for the classification was rational. Needless to say, few statutes were invalidated as irrational under this latter test.

In both *Isakson v. Rickey, supra* at 362, and *State v. Erickson*, 574 P.2d 1, 12 (1978), we based our new or "intermediate" equal protection test on that suggested in a perceptive law review article by Professor Gerald Gunther.[6] A considerable portion of his article was devoted to analyzing the United States Supreme Court's (then) recent opinions under the equal protection clause as compared to the opinions of earlier years. He suggested that courts, and particularly the United States Supreme Court, should not, in applying the lower-tier "rational basis" test, resort to conjectural or hypothetical purposes in assessing whether the legislative means selected furthered a legitimate purpose. Instead, he proposed that the courts should look to the actual purposes that the legislature had in mind in enacting the statute under review.[7]

In the last analysis Professor Gunther's plea is simply for judicial moderation, "a suggestion of a direction for modest interventionism,"[8] in the review of statutes under the equal protection clause.

This is hardly a new theme. In a tightly woven analysis of judicial review of legislation, Judge Learned Hand has pointed out the difficulty of discovering the constituent factors which underlie any piece of legislation, a task which he terms "a hazardous duty." L. Hand, The Bill of Rights 37 (1958). Unless there were dissatisfaction with the existing status quo, he points out, there would be little need for a legislative enactment. The legislature must try to gain an understanding of the facts as they are and engage in a "prophetic forecast" of the probable effects of the proposed law. As he states, it is extremely difficult for a court to ascertain the policy underpinnings of the statute:

> "[N]ot only is it substantially impossible to forecast the remoter results of any social readjustment, but it is even more difficult to know how far the command will be obeyed. However, difficult as both these undertakings are, they are relatively simple compared with deciding whether the proposed change will be beneficial to the society on which it is imposed. That presupposes a choice and all choices depend upon an appraisal of the values and sacrifices to which the contemplated action will give rise. Values and sacrifices are incommensurables, not being made up of elements common to each other, unless they are themselves composite—which only multiplies the difficulty."

*Id.* at 37–38.

What must be understood is that when we adopted the "intermediate" test for reviewing the validity of legislative classification under the Alaska equal protection

---

6. G. Gunther, "Foreward, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1 (1972). The article was part of the annual review and appraisal of the 1971 term of the United States Supreme Court.

7. Even the ascertainment of purposes under the Gunther model is somewhat elastic. One approach which he suggests is that courts look to the purposes articulated by the legislature in the process of the enactment of a law. *Id.* at 44–46. But he also suggests that the purposes articulated by the defenders of the law, i. e., the state's legal representatives, should be accepted: "A state court's or attorney general office's description of purpose should be acceptable." *Id.* at 47.

He concedes that, "identifying the purposes against which the means are to be measured is not a simple undertaking." *Id.* at 46. And, most relevant to the case at bar, he states: "A legislature may legitimately have a multiplicity of purposes, especially in carving exceptions from the scope of a general statute. Court inquiry should not be limited to a primary purpose; subsidiary purposes may also support the rationality of a means." *Id.* at 47.

8. *Id.* at 48.

clause, we did not achieve a magical liberation from the analytical difficulties presented by that clause. We merely took a position of moderation between what we perceived as the iron rigidity of the polar opposites of the federal "two-tiered" test. While the Alaska test may be less deferential toward the legislative means selected, it does not mean that we can substitute our will or judgment as to questions which are traditionally within the legislative competence. We must still remain sensitive to the complexity of many of the matters which are addressed by the legislature in dealing with the societal and economic problems of our age.

Similarly, although we require a "fair and substantial relation" between means and ends, this does not mean that we can ignore the context out of which the legislation emerged. It must be kept in mind that when the legislature deals with a group of problems in a comprehensive manner, it is unlikely that the solutions achieved will be simplistic, utterly symmetrical, or mathematically precise. If such resolutions were required, it is doubtful that government, in any sense that we have ever known it in the past, could any longer function.

After this prelude, we come closer to the problem which confronts us in this case.

One can best understand court decisions under the equal protection clause by placing them in their proper categories.[9] Legislative expressions of socioeconomic policy are in a district category.

"The need for the pervasive regulation of socioeconomic life characteristic of government in advanced industrial society is generally acknowledged; and correspondingly, the notion that such regulation is constitutionally problematic is generally rejected. Consequently, most differences that serve as the basis of socioeconomic classification and regulation are per-

ceived to be differences to which government may attach significance. They are *deemed* differences relevant to the legitimate aims of modern social policy."

Perry, *supra* note 4, at 1071–72 (emphasis in original).

The tax exemption is not only in the category of socioeconomic legislation, but is also in the category of tax legislation. It has been long established that a state legislature, when it acts in the field of taxation, has the widest possible latitude in setting up classifications and rates of taxation. As the United States Supreme Court stated in *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245, 1253 (1937):

"It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. This Court has repeatedly held that inequalities that result from singling out of one particular class for taxation or exemption infringe no constitutional limitation." (Citations omitted.)

Similarly, in *Madden v. Kentucky*, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940), which sustained a discriminatory ad valorem tax on bank deposits, the court noted that, "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification." 309 U.S. at 88, 60 S.Ct. at 408, 84 L.Ed. at 593.

One researching the matter will find that the cases are legion in which taxation systems have been upheld against equal protection attacks. When no other specific constitutional right is infringed and only the equal protection clause is relied upon, state taxation systems are almost invariably sustained.[10]

---

9. Challenges under the equal protection clause are treated differently according to the classifications they establish and the means the legislature chooses. For enumeration and discussion of the major categories, see G. Gunther, Constitutional Law (9th ed. 1975); L. Tribe, American Constitutional Law (1978); M. Perry, *supra* note 4.

10. Statutes which directly impair a specific, separate constitutional right must, of course, be invalidated. Thus in *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the court struck down under the First Amendment a tax which discriminated against newspapers. Taxes which discriminate against interstate commerce are similarly inval-

That the principle of broad legislative discretion is still vital can be discerned in the case of *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). In that case the Illinois Constitution had been amended so that individuals were exempted from personal property taxes, but corporations and "non–individuals" were still subject to such taxes. The court unanimously sustained the tax against an attack under the equal protection clause, and in so doing drew heavily upon its earlier cases rejecting such equal protection claims.[11]

A recent decision of one of our sister states exemplifies the same principle. In *Huckaba v. Johnson,* 281 Or. 23, 573 P.2d 305 (1978), the Oregon personal income tax act provided for an exclusion from income of certain payments received under retirement systems established by the United States, but denied this exclusion to military retirees until age 65. The court sustained the statute against an equal protection attack. The distinction was permissible because of the generally lower age of retirement by military personnel and their consequent ability to enter second careers more readily than civilian federal retirees. Even though the statute would not create anything approaching parity between the two groups, and in some instances would produce a grossly significant difference, the court nevertheless sustained the provision. It held that general rules are permissible in devising complex tax systems, and it is not necessary that the impact of taxation categories be the same as to each person affected by them.

It can be argued that these cases are not determinative because some (though not all) of them employ a conjectural rational basis test, not the Alaska test of equal protection. But a careful reading of these cases will reveal that they establish a far-reaching, underlying principle: that in matters of taxation the discretion and power of the legislature is at maximum, and the scope of judicial review or intrusion into the realm of taxation policy is correspondingly limited. Moreover, a close reading of some of the recent United States Supreme Court cases, discussed later in this opinion, will reveal that the court has been concentrating more closely on the actual purposes of the legislation being reviewed under the equal protection clause, and is not relying on mere conjecture or hypothesis as to the legislative purpose. Yet, as will be seen, these recent cases sustain the freedom of state legislatures to make broad determinations in matters of economic policy, taxation, and the management of the government itself. But, before moving on to a discussion of these recent cases, it may be helpful to place the matter of taxation and the equal protection clause in its historical context.

The notion that taxation policy is fundamentally a matter of legislative discretion, and that judicial non–intervention, except in certain discrete instances, is the norm, is deeply embedded in our traditional governmental structure. It is an old and constant theme in American constitutional law. It is, in short, a constitutional principle of first magnitude.

One of the seminal statements about the nature and operation of the taxing power was uttered by Chief Justice Marshall in his landmark opinion in *M'Culloch v. Maryland,* 4 Wheat 316, 428, 4 L.Ed. 579, 607 (1819):

"It is admitted that the power of taxing the people and their property is essential

---

idated. *See Michigan–Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954).

11. *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 526–27, 79 S.Ct. 437, 440–441, 3 L.Ed.2d 480, 484–85 (1959); *Magnano Co. v. Hamilton,* 292 U.S. 40, 44–47, 54 S.Ct. 599, 601–602, 78 L.Ed. 1109, 1114–16 (1934); *Lawrence v. State*

*Tax Commission,* 286 U.S. 276, 283, 52 S.Ct. 556, 558, 76 L.Ed. 1102, 1107–08 (1932); *White River Lumber Co. v. Arkansas,* 279 U.S. 692, 49 S.Ct. 457, 73 L.Ed. 903 (1929); *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).

to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against abuse of this power is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives, to guard them against its abuse."

A similar view was expressed over a century ago by Thomas M. Cooley, widely regarded as one of the pre–eminent constitutional scholars and jurists of his time:

"The power to impose taxes is one so unlimited in force and so searching in extent, that courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. . . . No attribute of sovereignty is more pervading, and at no point does the power of the government affect more constantly and intimately all the relations of life than through this power."

T. M. Cooley, Constitutional Limitations 479 (1868).

Mr. Justice Holmes expressed the same views in some of his trenchant dissents, which later became the accepted doctrine of the United States Supreme Court. In *Schlesinger v. Wisconsin*, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926), a state statute classified gifts made within six years of death as gifts made in contemplation of death, and thereby taxable under the inheritance tax laws. A majority of the court invalidated the statute as denying equal protection of the laws. Holmes, J., joined by Brandeis and Stone, JJ., dissented:

"[I]n dealing with state legislation upon matters of substantive law we should avoid with great caution attempts to substitute our judgment for that of the body whose business it is in the first place, with regard to questions of domestic policy that fairly are open to debate."

.     .     .     .     .

"[T]he law allows a penumbra to be embraced that goes beyond the outline of its object in order that the object may be secured."

270 U.S. at 241, 46 S.Ct. at 262, 70 L.Ed. at 564.

This is merely a specific instance of a more general belief by Mr. Justice Holmes about the workings of our constitutional system, which he often voiced during his long span as a jurist. As he stated, dissenting in *Truax v. Corrigan*, 257 U.S. 312, 344, 42 S.Ct. 124, 134, 66 L.Ed. 254, 268 (1921):

"There is nothing that I more deprecate than the use of the 14th Amendment beyond the absolute compulsion of its words to prevent the making of social experiments that an important part of the community desires, in the insulated chambers afforded by the several states, even though the experiments may seem futile or even noxious to me and to those whose judgment I most respect."[12]

As we have seen, the formulation of tax policy is at the heart of the legislative function. Because taxation affects such a wide variety of conflicting interests, and because the affected interests are often interrelated to a small or large extent, it is only right that the resolution of the contending socie-

---

12. Similarly, Holmes, J., dissenting in *Tyson v. Banton*, 273 U.S. 418, 446, 47 S.Ct. 426, 433, 71 L.Ed. 718, 729 (1927), said:

"I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the state, and that courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that .the particular court may happen to entertain."

tal and economic forces should be achieved through the tug–and–pull and the dramatic tensions of the legislative process. This thesis was articulated on one occasion by Professor (later Mr. Justice) Felix Frankfurter:

"Taxation is perhaps the severest testing ground for the objectivity and wisdom of a social thinker. The enormous increase in the cost of society and the extent to which wealth is now represented by intangibles, the profound change in the relation of the individual to government and the resulting widespread insistence on security, are subjecting public finance to the most exacting demands. To balance budgets, to pay for the costs of progressively civilized social standards, to safeguard the future and to divide these burdens fairly among different interests in the community, put the utmost strain on the ingenuity of statesmen. They must constantly explore new sources of revenue and find means of preventing the circumvention of their discoveries. Subject as they are, in English–speaking countries, to popular control, they should not be denied adequate latitude of power for their extra–ordinarily difficult tasks."

F. Frankfurter, *Mr. Justice Holmes and the Supreme Court* 70 (1961).

That the doctrine of judicial non–intervention in the field of economic and social legislation enjoys vitality today can be discerned in a number of recent opinions of the United States Supreme Court.

In *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), a Maryland statute paid a bounty to scrap processors for destroying automobile bulks abandoned in Maryland. Maryland processors were only required to submit an "indemnity" agreement to claim the bounty, but non–Maryland processors had to submit documents of title in order to claim the bounty. The statute was attacked as violating the commerce clause and the equal protection clause of the United States Constitution.

The court held that the equal protection clause was not violated. Maryland could presume that in–state processors are more likely to destroy automobile bulks which were abandoned in Maryland than were out ·of ·state processors. It could rationally differentiate between those two groups as to the proof of title as a prerequisite of claiming the bounty. In this connection the court stated:

"It is well established, however, that a statutory classification impinging upon no fundamental interest, and especially one dealing only with the economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. That Maryland might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional." (Citations omitted.)

426 U.S. at 813, 96 S.Ct. at 2499, 49 L.Ed.2d at 233.

In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the court sustained a state veteran's preference law against equal protection attack. The statute provided that all veterans, male or female, who qualify for state civil service positions must be considered for appointment ahead of qualifying non–veterans. Although the statutory preference was available to both males and females, it was attacked by Feeney on the ground that the statute inevitably operated to exclude women from the Massachusetts civil service jobs, and thus violated equal protection.

Noting that significant numbers of non–veterans are men, the court was unable to conclude that the purpose of the law was to discriminate on the basis of sex. The court stated:

"Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. The calculus of effects, the manner in which a

particular law reverberates in a society, is a legislative and not a judicial responsibility." (Citations omitted)

442 U.S. at 271–72, 99 S.Ct. at 2292, 60 L.Ed.2d at 883.

*Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), sustained a federal statute requiring retirement of foreign service officers at age 60 against an equal protection attack.[13] The court pointed out that when a statute does not create a "suspect" classification or burden a fundamental interest,

> "[C]ourts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless

the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." [Footnotes omitted.]

440 U.S. at 97, 99 S.Ct. at 942, 59 L.Ed.2d at 176.[14]

The overall purpose of the Alaska enactment at issue here was to grant relief from individual income taxation. One possibility was simply outright repeal of all income taxes. But some forces in the legislature apparently wanted to assure that persons should make some contribution to the cost of government before enjoying the benefits of a full exemption from individual income taxes. The plan can also be viewed as a way of giving some measure of parity between persons who had contributed to the cost of government in the past and those who would earn income but pay nothing if there were an outright repeal.[15] Subsidiary

---

**13.** Equal protection was here invoked as a component of the due process clause of the Fifth Amendment to the United States Constitution.

**14.** In *Massachussets Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), the court sustained a state law requiring uniformed police officers to retire at age 50 against an equal protection challenge. "Perfection in making the necessary classification is neither possible nor necessary." 427 U.S. at 314, 96 S.Ct. at 2567, 49 L.Ed.2d at 525 (citation omitted).

> "That the state chooses not to determine fitness more precisely through individualized testing after 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum–age limitation. It is only to say that with regard to the interest of all concerned, the state perhaps has not chosen the best means to accomplish this purpose." (Footnote omitted.)

427 U.S. at 316, 96 S.Ct. at 2568, 49 L.Ed.2d at 526.

**15.** There is some question whether achieving parity by accounting for past tax contributions is a permissible state goal. In *Shapiro,* 394 U.S. at 632, 89 S.Ct. at 1330, 22 L.Ed.2d at 614, the court noted

> "that the challenged classification may be sustained as an attempt to distinguish between new and old residents on the basis of the contribution they have made to the community through the payment of taxes.…

> [That] would permit the states to apportion all benefits and services according to the past contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services." (Footnote omitted.)

However, the Court later sustained one–year residency requirements for lower in–state university tuition. *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), *aff'd without opinion,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971); *Kirk v. Board of Regents,* 273 Cal. App.2d 430, 78 Cal.Rptr. 260 (1969), *appeal dismissed,* 396 U.S. 554, 90 S.Ct. 754, 24 L.Ed.2d 747 (1970). In both *Kirk* and *Starns,* the states justified the tuition differential based on goals of cost equalization and contribution to the state's economy. *Starns,* 326 F.Supp. at 240, *Kirk* 78 Cal.Rptr. at 269. Although in *Vlandis,* 412 U.S. at 450 n.6, 93 S.Ct. at 2235 n.6, 37 L.Ed.2d at 70 n.6, the Court repeated its concern that classification based on past contributions raised "grave problems under the Equal Protection Clause," that rationale was not part of the decision.

It appears that the Supreme Court was concerned that a state would limit essential public services, such as parks, schools, police and fire protection, *see Shapiro,* 394 U.S. at 632, 89 S.Ct. at 1330, 22 L.Ed.2d at 614, to those who had made past contributions. The tax exemption is neither a public benefit or service of the kind described. I am persuaded by the dissenting opinions in both *Shapiro* and *Vlandis,* that cost equalization is a permissible goal. *Vlandis,* 412 U.S. at 468–69, 93 S.Ct. at 2244–2245,

goals are those of retaining a competent staff to administer the income tax laws of the state and of not saddling individuals with an empty and burdensome annual filing requirement.

These are legitimate purposes. It is quite permissible for a state to grant tax relief in a retrospective fashion as to a particular class of taxpayers or, conversely, to alter a taxation system so that one class remains liable while another class is relieved of liability. In *Lehnhausen v. Lake Shore Auto Parts Co., supra,* individuals were exempted from personal property taxes, while corporations still remained subject to them. This action was held valid by a unanimous United States Supreme Court against an attack based on the federal equal protection clause. Similarly, in *White River Lumber Co. v. Arkansas,* 279 U.S. 692, 49 S.Ct. 457, 73 L.Ed. 903 (1929), a statute imposed a retroactive tax on undervalued or underassessed lands of corporations, but not on similar lands of individuals. This law was also held valid under the equal protection clause.

Tax legislation, such as the law in question here, is often based on the social and economic values of a particular legislature. Because this involves difficult political judgments, courts should be most reluctant to intervene. In addition,

"[t]o stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."

37 L.Ed.2d at 81 (Rehnquist, J., dissenting with whom Douglas, J., joins); *Shapiro,* 394 U.S. at 673–74, 89 S.Ct. at 1352, 22 L.Ed.2d at 638 (Harlan, J., dissenting).

16. The application of the abstract notion of equality has perplexed thinkers throughout the ages. For example,

"In a socialistic system, you're no better or no worse than anybody else."

*New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747, 771 (1932) (Brandeis, J., dissenting). Taxation is an area of legislative activity in which compromise between fiercely contending forces is often achieved. Excessive and improvident decisions should be rectified by the democratic processes and by the political composition of future legislatures. It is not the business of the courts to determine broad questions of taxation policy, and judicial intervention is warranted under the equal protection clause only when the legislative treatment of different groups is so unrelated to furthering a combination of legitimate purposes that we must find the action of the legislature truly irrational. In determining what is rational legislative action, one looks for

"an affirmative relation between means and ends . . . . To a large extent, that is an empirical inquiry. . . . But such an inquiry would be neither mechanical nor value–free. Requiring compulsively neat logical correlations between classification and objective would ignore legitimate demands for legislative flexibility. The inquiry, like others entrusted to the Court, would involve questions of degree, turning on sensitivity to legislative realities and not on purely abstract considerations of fairness . . . . The line between means and ends will be drawn primarily in such terms of breadth of value judgments; it will present the most difficult questions of degree." (Footnotes ommited.)

G. Gunther, *supra* note 6, at 47–48.[16]

Limited guidance in these questions of degree is provided in *Travis v. Yale & Towne Manufacturing Co.,* 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920), and *Austin v.*

"But that's equality!"
". . . . Equality is not in regarding different things similarly, equality is in regarding different things differently."
T. Robbins, Still Life With Woodpecker 97 (1980). *See also* E. Bodenheimer, Power, Law, and Society 180–84 (1973).

*New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). In *Travis*, the Court found invalid a New York tax scheme which, although it taxed residents and non-residents at the same rate, granted New York residents some exemptions which were not available to nonresidents. In *Austin*, the operation of the tax provisions and exemptions allowed the tax to fall *"exclusively on the income of nonresidents; ..."* 420 U.S. at 665, 95 S.Ct. at 1197, 43 L.Ed.2d at 537–38 (emphasis supplied). The similarity in the two cases is that the tax imposed obligations *directly* related to one's residency. In contrast, the Alaska exemption does not automatically tax nonresidents to the exclusion of residents. At the same time, the exemption does substantially further the legislative goals of assuring contribution from persons for the cost of government before enjoying the full exemption, and of achieving some degree of parity between new taxpayers and those who have made earlier contributions. In addition, the legislation provides a means to continue to train a competent staff of tax administrators. The state could have provided an exemption for all taxpayers, but still could have required returns to be filed for training purposes. This would be of little value for the state tax administrators because there would be no money at stake and it would saddle individuals with an empty and burdensome annual filing requirement. The present exemption, or a number of alternative provisions, could substantially achieve the legislative purposes.

In the area of taxation and socioeconomic legislation, our function is not to choose for the legislature the provision that would most precisely fit its stated purposes. We need only look at whether the methods are a rational means of achieving the goals.[17] Since the Alaska tax exemption does not discriminate between residents and nonresidents and because it substantially meets its

purposes, I would hold that the statutory classification is rationally related to its legitimate purposes. Thus, I would declare the tax exemption statute to be valid, and would reverse the judgment of the superior court.

BURKE, Justice, dissenting.

I join in the scholarly dissent of my esteemed colleague, Mr. Justice Connor. For the reasons that he has stated, I am satisfied that the tax exemption statute, AS 43.20.017(a)–(c), violates none of the constitutional provisions relied upon by the Zobels and the superior court. Thus, I too would reverse.

---

17. "The equal protection clause imposes no rigid rule of equality of taxation. Inequalities which may result in singling out one particular class for a reduction in taxation are not prohibited. Only if the classification has no rational basis and is patently arbitrary may it

be set aside as unconstitutionally discriminatory."
*Desco Products Caribbean, Inc. v. Government of Virgin Islands*, 511 F.2d 1157, 1160 (3rd Cir. 1975).